**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| CLARE BRONFMAN,<br><br>  Petitioner-Plaintiff,<br><br>v.<br><br>TIMETHEA PULLEN, in her official capacity as Warden of FCI Danbury; FEDERAL BUREAU OF PRISONS; BRYAN ANTONELLI, in his official capacity as Acting Regional Director of the Federal Bureau of Prisons' Northeast Region; MICHAEL CARVAJAL, in his official capacity as Director of the Federal Bureau of Prisons,<br><br>  Respondents-Defendants. | Case No. |

**PETITION FOR A WRIT OF HABEAS CORPUS**
**PURSUANT TO 28 U.S.C. § 2241**

Petitioner-Plaintiff Clare Bronfman ("Petitioner" or "Ms. Bronfman"), by and through her attorneys, The Law Office of Michael L. Chambers Jr., Ronald Sullivan Law PLLC, and Levin & Associates PLLC, as and for her Petition against Respondents-Defendants Timethea Pullen, in her official capacity as Warden of FCI Danbury; the Federal Bureau of Prisons; Bryan Antonelli, in his official capacity as Acting Regional Director of the Federal Bureau of Prisons' Northeast Region; and Michael Carvajal, in his official capacity as Director of the Federal Bureau of Prisons (collectively, "Respondents"), alleges as follows:

**SUMMARY OF ACTION**

1.      Since approximately December 28, 2020, Ms. Bronfman has been subjected to unlawful conditions of confinement within the Federal Bureau of Prisons (the "BOP") following her September 30, 2020 sentencing before United States District Judge Nicholas G. Garaufis of

the United States District Court for the Eastern District of New York. *See* Order, *United States v. Bronfman*, Case No. 18-cr-204 (NGG) (E.D.N.Y. Sep. 30, 2020), ECF No. 937.

2.      Ms. Bronfman has been subjected to these conditions as a result of an arbitrary and capricious decision by the BOP to apply a "sex offender" Public Safety Factor ("PSF") against her. In applying this PSF, the BOP not only abused its discretion and violated its own internal guidelines and policies, it also relied on demonstrably false factual claims to justify the PSF designation.

3.      Indeed, there is no credible evidence to support the BOP's determination that Ms. Bronfman is a sex offender or is in any way eligible for the sex offender PSF, a fact clearly recognized by Judge Garaufis when he sentenced her. Rather, in determining that the sex offender PSF is appropriate as to Ms. Bronfman, the BOP has either fundamentally misunderstood or mischaracterized her Presentence Investigation Report ("PSR") or relied on demonstrable and provable factual errors to support its determination. The resulting application of the PSF as to Ms. Bronfman is therefore arbitrary and capricious and constitutes an abuse of the BOP's discretion.

4.      Absent this Court granting a writ or other appropriate order directing the BOP to remove the PSF, Ms. Bronfman will remain detained in custody under conditions of confinement that are clearly unlawful and unwarranted given the circumstances of her offense of conviction. In light of these facts, Ms. Bronfman respectfully requests that the Court issue a Writ, pursuant to 28 U.S.C. §§ 2241(a) and (c)(1), 2242, and 2243, directing the BOP to remove the PSF in her file so that she may be re-designated to a more appropriate BOP facility. The proper designation will also affect her rights and the availability of certain benefits under the Formerly Incarcerated Reenter Society Transformed Safely Transitioning Every Person Act, i.e., the "FIRST STEP Act."

5.      The consequences of this mis-designation are huge to Ms. Bronfman in that, among other collateral consequences, it may cause her not to qualify for early release under the FIRST STEP Act (although as set forth below her exclusion from the FIRST STEP program would be contrary to the Act itself). This could be the difference of approximately two years of incarceration. Ms. Bronfman faces a similar unfair and improper collateral consequence regarding her ineligibility for the CARES Act, as a consequence of BOP's arbitrary and capricious designation decision.

## JURISDICTION

6.      Ms. Bronfman brings this action under 28 U.S.C. §§ 2241(a), (c)(1), 2242, and 2243. Ms. Bronfman further invokes this Court's jurisdiction under 28 U.S.C. §§ 1331, 1651, 2201, and 2202. This Court has authority under 28 U.S.C. § 2241 to grant the writ of habeas corpus.

## VENUE

7.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(e) and 2241 because Ms. Bronfman is currently detained in custody in the district.

## PARTIES

8.      Petitioner Clare Bronfman is 43 years old and currently incarcerated in the Federal Correctional Institution, Danbury ("FCI Danbury") at the Federal Satellite Low facility, located in Danbury, Connecticut.

9.      Respondent Timethea Pullen is the warden of FCI Danbury. She is sued in her official capacity.

10.     Respondent Bryan Antonelli is the Acting Regional Director of the BOP's Northeast Region. He is sued in his official capacity.

11.     Respondent Michael Carvajal is the Director of the BOP. He is sued in his official capacity.

12.     Respondents are directly responsible for any activities undertaken by or under the supervision of any agents or employees acting on their behalf. All references to Respondents' actions in this Petition include activities performed by Respondents' agents or employees, and other government agents or employees.

## BACKGROUND

**A.     Ms. Bronfman Was Convicted of Non-Sex Trafficking Offenses, but the PSR Drafted by the United States Probation Office Nonetheless Includes Irrelevant Descriptions of Sex Offenses Alleged Against Her Co-Defendants.**

13.     Ms. Bronfman was arrested by federal agents on July 24, 2018 and subsequently charged in a multi-count indictment. On April 19, 2019, Ms. Bronfman pled guilty to two charges: Conspiracy to Conceal and Harbor Aliens for Financial Gain, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(v)(I) and 1324(a)(I)(B)(i), and Fraudulent Use of a Means of Identification, in violation of 18 U.S.C. § 1028(a)(7).[1]

14.     As set forth in Judge Garaufis' Sentencing Memorandum, the conviction for the immigration offense at issue stems from Ms. Bronfman's role in securing a visa for a Mexican national ("Jane Doe")[2] who was employed by a company affiliated with a company called NXIVM, an executive coaching and self-help organization founded by Ms. Bronfman's co-defendant, Keith Raniere. A true and correct copy of Judge Garaufis' Sentencing Memorandum is attached hereto as Exhibit A.

---

[1] The Fraudulent Use of a Means of Identification charge is not pertinent to Ms. Bronfman's instant habeas corpus petition, as the BOP did not rely on it in determining whether to apply the sex offender PSF.

[2] In relevant court documents, this individual is referred to as "Jane Doe 12."

15.     Following her conviction, the United States Probation Office conducted a presentence investigation and drafted a PSR for, *inter alia,* the court's consideration in determining Ms. Bronfman's sentence.

16.     Ms. Bronfman's PSR outlines the conduct underlying her offenses of conviction. A true and correct copy of Ms. Bronfman's PSR is attached hereto under seal as Exhibit B.

17.     Unfortunately, Ms. Bronfman's PSR also delves into irrelevant, excruciating, and unnecessary detail concerning the alleged actions and activities of her co-defendants, including details and descriptions of Dominus Obsequious Sororium ("DOS"), a secret organization comprised of certain individuals, some of whom, but not all, had taken NXIVM courses. Ms. Bronfman objected to the fact that her PSR regurgitated details and descriptions related to the alleged sex trafficking offenses of Mr. Raniere and other co-defendants, but Judge Garaufis declined to rule on those objections. A true and correct copy of Ms. Bronfman's Objections to the PSR is attached hereto under seal as Exhibit C.

18.     Although Ms. Bronfman's *co-defendants* were convicted of several crimes, including "sex trafficking conspiracy[] and two counts of sex trafficking," **_no such conspiracy charges or substantive sex trafficking allegations were ever leveled against Ms. Bronfman_** and the description of those activities by others described in the PSR were not relevant conduct to her own offense of conviction. Ex. A at 6-7.

19.     Not only did Ms. Bronfman not participate in any of the DOS or alleged sex trafficking-related activities described in the PSR, she was not even aware of any such alleged activity. Indeed, members of DOS, including three of Ms. Bronfman's co-defendants, kept DOS a secret from Ms. Bronfman, as is the nature of any secret society, and she had no idea that the group existed until it was revealed publicly in 2017. *See, e.g.*, Ex. A at 6 n.2 ("Paragraph 14 [of the PSR

Addendum discussing DOS] does not state that Ms. Bronfman *was aware of or involved with DOS, or that she directly funded it*.") (emphasis added).

20.     There was zero evidence at Mr. Raniere's trial from any DOS witness that Ms. Bronfman was told about DOS.  Indeed, as set forth below and herein, evidence at trial showed that DOS was kept secret from the NXIVM community from the time of its formation until May 2017.

21.     Any and every of Ms. Bronfman's codefendants who testified about DOS affirmed that she didn't participate and had no knowledge of DOS until the world learned about it via a media exposé. The government's "star" witness in the Raniere trial made it clear that DOS's existence was kept secret, including Ms. Bronfman.  Lauren Salzman testified during the trial that all DOS meetings were secret, and that the group, including Keith Raniere's involvement in the group, was a secret.  (*See* Salzman Testimony at 1509-10: secret DOS meetings were initially "held at people's homes" before they were held at "the sorority house" that the group purchased; it was "concealed that Keith was – was the founder of the group, was a member of the group, and participated in any way in the group").  She further testified, as did other DOS members, that no one was provided with any information about the group until they were invited to learn about it and provided collateral – "something valuable enough or damaging enough that would ensure a total commitment to secrecy; that you would rather -- that you would keep a secret like until you died than have this information come out"  (*See* Salzman Testimony at 1602-03).

22.     In other words, the conduct that formed the core of the criminal case against Mr. Raniere, Ms. Mack and Ms. Lauren Salzman was concealed from Ms. Bronfman by her supposed co-conspirators.

23.     Furthermore, even after Ms. Bronfman learned of DOS's existence, members of DOS continued to conceal from her many aspects of DOS, including the aspects of it that ultimately led to the criminal prosecution of some of her co-defendants for sex trafficking and other crimes.

24.     The government's star witness, Lauren Salzman, testified at trial that even after the existence of the group became public, they lied to everyone in the community, including her own mother, about Mr. Raniere's involvement. She testified that she "lied to the entire community about it […] lied to the media about it [and] lied to everybody about it" (See Salzman Testimony at 1802-03.) According to Ms. Salzman, "Keith directed that we [DOS members] were not going to tell anybody about his involvement, [that] it was going to be secret, that he didn't know anything about it, that he wasn't associated with it, that the brand was not his initials and he gave several options for how [DOS members] could address the concerns that were being raised to make it look like they were all things that were not the truth." (*See* Salzman Testimony at 1798-79).

25.     In an August 2017 address to the NXIVM community during "Vanguard Week," Mr. Raniere "said he wasn't affiliated with DOS, that he had very little knowledge about it but he advocated for the group and he said some of the things in the group were a little racy and could be seen as, you know, alternative but that ultimately he thought they were good and essential." (*See* Salzman Testimony at 1817). "Allison [Mack] and [Salzman] later went to address the NXIVM community […] and communicated much of what Keith had communicated at V Week, what was in his position statement, what he had discussed with [Salzman] at Punta Mita and answered questions that they [the NXIVM community] had." (*See* Salzman Testimony at 1859.)

26.     Lauren Salzman testified at trial this was kept secret from Ms. Bronfman and was purposefully arranged for a time when Ms. Bronfman was not present, but rather away in Mexico.

Tr. 1887: "everybody left, everybody who had been on the trip left except myself, Loreta, Daniella, Nicki and Allison and we stayed to – for this recommitment ceremony. . . Q. Had Clare Bronfman and Marianna, among others, been some of the people who had been present previously? A. Yes. Q. Were they aware of what was to take place? A. No."

27.     Indeed, even the United States recognizes that Ms. Bronfman had no knowledge of DOS or its activities. The government even has conceded that members of DOS did not "disclsose[] their membership in DOS to [Ms. Bronfman]" until after the existence of DOS was revealed by media in 2017. *See* Letter to Hon. Nicholas G. Garaufis from Assistant U.S. Attorney Tanja Hajjar dated September 2, 2020 (ECF No. 927).

28.     As such, Ms. Bronfman was not charged with—much less convicted of—a sex trafficking conspiracy or any other substantive sex trafficking offense.

29.     These facts were recognized by Judge Garaufis in his Sentencing Memorandum where he made clear that Ms. Bronfman was not, and has not ever been, accused of ***any*** sexual offenses. Judge Garaufis went on to state that he wanted to make it "crystal clear [that] Ms. Bronfman was not convicted of" the crimes perpetrated by her co-defendants. Instead, Judge Garaufis stated that he "agree[d] with Ms. Bronfman that the available evidence does not establish that she was aware of DOS prior to June 2017 *or that she directly or knowingly funded DOS or other sex trafficking activities*," Ex. A at 7 (emphasis added), and that he did "not find that Ms. Bronfman knowingly funded a sex cult," *id.* at 16.

30.     After making these findings, Judge Garaufis sentenced Ms. Bronfman to an 81-month prison sentence and recommended that she be detained at the minimum-security camp facility in Danbury, Connecticut. Judgment and Commitment Order, at 2 (Oct. 7, 2020), Case No.

18-cr-204 (NGG), ECF No. # 946, a true and correct copy of which is attached hereto as Exhibit D.

**B.      The BOP Unfairly and Arbitrarily Tagged Ms. Bronfman with a Sex Offender PSF Based on the False and Misleading PSR.**

31.      Ms. Bronfman's convictions were limited to the fraudulent use of a means of identification as well as a criminal immigration violation involving her sponsorship of a Mexican citizen in order to facilitate that individual's work for an entity affiliated with NXIVM.  For the BOP to tag her with a sex offender PSF based on the actions of her co-defendants, which Judge Garaufis concluded she knew nothing about and that the government admits the same in its representations, is manifestly unjust.

32.      Broadly, the application of a PSF signals that an inmate has "demonstrated behaviors which require increased security measures to ensure the protection of society."  Federal Bureau of Prisons, Policy No. 5100.08 CN-1, *Inmate Security Designation and Custody Classification* (the "Program Statement") (Sept. 4, 2019) at Ch. 2, p. 4, available at: https://www.bop.gov/policy/progstat/5100_008cn.pdf. PSFs "are applied to inmates who are not appropriate for placement at an institution which would permit inmate access to the community."

33.      The application of the sex offender PSF precludes an inmate from being designated to any BOP institution with a security classification below "low." *Program Statement* at Ch. 5, p. 8 (emphasis added).

34.      The application of the sex offender PSF also precludes inmates from being assigned to a Community Corrections Center ("CCC"). Federal Bureau of Prisons, Policy No. 7310.04, *Community Corrections Center (CCC) Utilization and Transfer Procedure* (Dec. 16, 1998) at p. 10, available at: https://www.bop.gov/policy/progstat/7310_004.pdf. "CCCs provide an excellent transitional environment for inmates nearing the end of their sentences. … One reason for referring

an inmate to a CCC is to increase public protection by aiding the transition of the offender into the community. … [E]ligible inmates should generally be referred to CCCs to maximize the chances of successful reintegration into society." *Id.* at p. 1. Other collateral consequences of the PSF include failing to qualify for early release under the Coronavirus Aid, Relief, and Economic Security ("CARES") Act and/or the First Step Act.

35.     In spite of Judge Garaufis' designation recommendation made during her sentencing hearing and included in his Sentencing Memorandum, the BOP made the erroneous decision, largely based on its arbitrary and capricious application of the sex offender PSF, to initially designate Ms. Bronfman to the Federal Correctional Institution, Tallahassee ("FCI Tallahassee"), a low security facility, located in Tallahassee, Florida.

36.     Regardless of this initial designation, Ms. Bronfman was never actually transferred to FCI Tallahassee. Instead, on or about December 28, 2020, following her sentencing, Ms. Bronfman was designated and transferred to the Federal Detention Center, Philadelphia ("FDC Philadelphia"), located in Philadelphia, Pennsylvania. Both FCI Tallahassee and FDC Philadelphia have higher security designations than the security classification of the facility that Judge Garaufis specifically recommended for Ms. Bronfman (*i.e.*, minimum security).

37.     In light of her improper designation, on March 2, 2021, Ms. Bronfman filed an Informal Resolution Attempt with the Unit Manager at FDC Philadelphia claiming that she had been wrongly designated to the institution as a result of the improper application of the sex offender PSF.

38.     When the Informal Resolution Attempt was denied on March 17, 2021, Ms. Bronfman promptly filed a BP-9 Administrative Remedy Appeal, which was denied on April 1, 2021.

39.     The BOP denied Ms. Bronfman's BP-9 appeal on the basis—again, according to BOP's incorrect reading of the PSR—that Ms. Bronfman "participated in efforts to recruit and secure immigration status for non-citizens so they could work in one or more NXIVM-affiliated organizations or to become sexual partners for a co-defendant."   Central Office Administrative Remedy Appeal, Appeal No. 1073720-F1, Part B Response (Apr. 1, 2021), a true and correct copy of which is attached hereto under seal as Exhibit E.   Specifically, the BOP found that among the individuals that Ms. Bronfman "assisted in entering or remaining in the United States were . . . Jane Does 2, 3, and 4" with whom Ms. Bronfman's co-defendants allegedly "initiated sexual relationships." *Id.* This is patently and demonstrably false as it pertains to Ms. Bronfman, and the United States is aware of this fact.  Jane Doe 4 testified at Mr. Raniere's trial, and both she and the government's star witness, Lauren Salzman, provided detailed accounts of how the sisters were brought into the country. ***Jane Doe 4 did not testify that Ms. Bronfman participated in facilitating her or her sisters' entrance into the country.*** Jane Doe 4's parents had paid for her to take a NXIVM course in Monterrey, Mexico, and encouraged Jane Doe 4 to join the NXIVM community in Albany, New York.  Other family members followed shortly thereafter. Indeed, Ms. Bronfman could not have assisted in bringing the sisters to the United States, as Ms. Bronfman herself joined NXIVM around the time Jane Does 2, 3, and 4 associated with NXIVM. *See, e.g*, Jane Doe 4 Testimony at 2312 ("Q And what was your -- what were your parents telling you? A My parents were not telling me to go one way or the other. I think they respected my decisions a lot and, honestly, they were also very much into like ESP and enamored with the curriculum. So they never told me do this or do that. They also didn't tell me you can't do this, you can't do that. So we were just discussing it, you know. "); *Id.* at 2313-14 ("A After that, we were all happy about my decision, including my parents. And so we started planning. And the plan ended up being that

the time to go coincided with something called -- well it coincided with Keith Raniere's birthday. So it was his birthday celebration. V week. So the plan was for my parents to go drop me off at, you know, at Albany to stay, staying by – staying through V week, setting me up and then leaving. Q So is this August 2002? A Yes. Q How old were you then? A 16."); *Id.* at 2321-2322 ("Q Now, after that event ended, you stayed in -- you stayed in the Albany area; is that right? A Yes, that was a plan. Q And your parents went home? A Yes. Q So where were you living at that time? A So the arrangement that was made was, I was to stay with -- there was a man called Edgar Boone, and he owned an apartment. Nothing really as close in Albany, so walking distance, but it was sort of close to the ESP center, which was in 455 New Garner Road."). ***No witness at Mr. Raniere's trial – not a single one – testified to the contrary.***

40.     Thereafter, Ms. Bronfman filed a BP-10 Administrative Remedy Appeal that was denied on August 16, 2021.

41.     Like its initial application of the PSF, BOP's reasoning underlying its denial of Ms. Bronfman's BP-9 is not supported by any "official documentation" that "clearly indicates" Ms. Bronfman engaged in the conduct described by the BOP.  Indeed, Ms. Bronfman was not charged with or accused of any immigration or sex trafficking-related offenses in connection with Jane Does 2, 3, or 4.

42.     The BOP's denial of Ms. Bronfman's BP-10 spells out in even more detail its reasoning than in its denial of the BP-9 appeal.  Specifically, in denying Ms. Bronfman's BP-10 appeal, the BOP stated that Ms. Bronfman "participated in efforts to recruit and secure immigration status for non-citizens, some of whom were minors, *so they could become sexual partners for a co-defendant*."  Central Office Administrative Remedy Appeal, Appeal No. 1073720-R2, Part B

Response (Aug. 16, 2021) (emphasis added), a true and correct copy of which is attached hereto under seal as Exhibit F.

43.     This putative justification by the BOP represents an egregious violation of Ms. Bronfman's Due Process rights. The BOP relies on factual errors that are both demonstrable and provable. They rely on factual allegations that range from physical impossibility to averments flatly contradicted by evidence supplied and advanced by the government itself. Ms. Bronfman could not have "recruited" Jane Does 2, 3, and 4. Ms. Bronfman, indisputably, was a professional horse jumper, working and living between Europe and Florida at the time the three sisters were "recruited" into NXIVM. Ms. Bronfman did not and could not have recruited them into NXIVM. *Ms. Bronfman was not even a member of NXIVM at the time Janes Does 2, 3, and 4 were recruited.* She didn't know them, had no way to have known them, and, significantly, there is no evidence – whatsoever – that Ms. Bronfman participated in recruiting Jane Does 2, 3, and 4, let alone for the purpose of sexual relations with Mr. Raniere.

44.     Again, BOP's strained reasoning is not supported by any "official documentation" that "clearly indicates" Ms. Bronfman engaged in the conduct described by the BOP and is squarely contrary to Judge Garaufis' findings.

45.     Ms. Bronfman appealed the denial of her BP-10 appeal by filing a BP-11 appeal on September 14, 2021. Ms. Bronfman, by through counsel, even sent a separate letter to BOP General Counsel explaining the foregoing described factual errors in a good faith effort to prevent a manifest injustice. Counsel explained that Ms. Bronfman was primarily living outside the country when Jane Does 2, 3, and 4 were recruited into NXIVM.  See Exhibit G.

46.     The BOP denied Ms. Bronfman's BP-11 appeal on January 18, 2022, stating that the "PSF was adequately applied in accordance with" the Program Statement and that "no new

information that had not been considered at the lower levels" had been provided. Central Office Administrative Remedy Appeal, Appeal No. 1073720-A3, Part B Response (Jan. 18, 2022) (emphasis added), a true and correct copy of which is attached hereto under seal as Exhibit H.  Ms. Bronfman thereby exhausted her administrative remedies for challenging the PSF.

47.     BOP's claim that "no new information" had been provided is patently false. If nothing else, counsel's letter to the General Counsel, Exhibit G, provided new information in light of BOP providing the more precise basis for its erroneous decision. A review of the trial transcript illuminates how demonstrably flawed BOP's analysis is.

48.     The trial transcript reveals clearly that Ms. Bronfman did not recruit Jane Doe 2 into the country, and she had no knowledge of any alleged sexual relationship with Jane Doe 2 and her co-defendant when Jane Doe 2 was underage. The transcript reveals that Jane Doe 2's living arrangement was kept a secret and not even the most senior NXIVM people knew anything about it.  Where Jane Doe 2 was living was kept a secret in the community and Ms. Salzman testified that "for the period of time when [she] think[s] she was still living at the Victory Way house, there was a story about how she was actually living with Karen Unterreiner . . . [a]nd a lot of people didn't know where she was."  Ms. Salzman did not even know where she was living and when she asked Mr. Raniere about it he did not give her an answer.  (Salzman Testimony at 1597).

49.     With respect to Jane Doe 3, the trial transcript clearly reveals that Ms. Bronfman joined NXIVM at about the same time as Jane Doe 3 in 2003. Accordingly, Ms. Bronfman could not and did not "recruit" her. Indeed, Ms. Bronfman and Jane Doe 3 were peers. Jane Doe 3 was 20; Ms. Bronfman was 24. Ms. Bronfman did not know anything about Jane Doe 3's immigration status when she first entered the country. At the time, Ms. Bronfman was a horse jumper, living in

Europe and Florida and competing around the world. ***Ms. Bronfman was not "recruiting"*** ***someone whom she did not even know to an organization to which she did not yet belong.***

50.     Specifically, Jane Doe 3 came to the United States with her immediate family members in 2003, having nothing to do with Ms. Bronfman.  Ms. Bronfman only began taking NXIVM classes herself in 2003, the same year that Jane Doe 3 arrived in the United States to live in Albany and take NXIVM curriculum.  It is therefore untrue that Ms. Bronfman made efforts to assist Jane Doe 3 in entering the United States, implying that Ms. Bronfman was instrumental in her initial entry to the United States.  Ms. Bronfman was 24 years old in 2003, and Jane Doe 3 was 20, so they were peers in the sense that they were of similar age and had joined NXIVM at around the same time.  Ms. Bronfman was unaware that Jane Doe 3 had begun a sexual relationship with Mr. Raniere until many years later; until then, Ms. Bronfman knew only that Jane Doe 3 lived in the same house as Mr. Raniere and Pam Cafritz, and that Jane Doe 3 was extremely close to Ms. Cafritz.

51.     On information and belief, BOP's confusion lies in that Ms. Bronfman did, at some much later point, help with Jane Doe 3's immigration status, but this assistance came in 2016, *more than a decade* after Jane Doe 3 entered the country. By this time, Jane Doe 3 lived with Mr. Raniere, a decision with which Ms. Bronfman was wholly uninvolved. Significantly, Ms. Bronfman had no role, whatsoever, in Jane Doe 3's initial entry into the country. BOP, apparently, has conflated Ms. Bronfman's 2016 immigration assistance with one of her co-defendant's 2003 recruitment efforts. As such, Ms. Bronfman did not "recruit" and could not have recruited Jane Doe 3 into the country.

52.     Ms. Bronfman had no involvement in Jane Doe 3's immigration status in the United States, and had no reason to know anything about Jane Doe 3's legal status in the United States

until after Ms. Cafritz was diagnosed with metastatic renal cancer in 2014.  After the diagnosis, Jane Doe 3 served as Ms. Cafritz's primary companion and caretaker, accompanying her to medical procedures and appointments, and caring for her as she recovered from chemotherapy sessions and surgeries.  At the time of the diagnosis, Jane Doe 3 was in the United States on a valid B1/B2 visitor's visa that allowed her to make multiple entries into the United States but limited the duration of her stay to no more than 180 consecutive days.  Although Jane Doe 3 was careful to leave the US without staying past the 180 days, U.S. Customs and Border Protection (CBP) officers began to caution Jane Doe 3 to secure a different type of visa as the cumulative amount of time she was spending in the United States appeared inconsistent with the purposes of a B1/B2 visa

53.     Only after Ms. Cafritz's diagnosis did Jane Doe 3 and Ms. Bronfman discuss ways that Jane Doe 3 could legally secure a different visa that would allow her to remain in the U.S. to help take care of Ms. Cafritz.  Ms. Bronfman's involvement escalated, however, on January 5, 2016, when CBP officers canceled Jane Doe 3's visa and denied her entry into the U.S. (See PSR ¶ 29). It is crystal clear from the objective record that Ms. Bronfman had nothing to do with Jane Doe 3's initial recruitment into the country. When Ms. Bronfman did assist with Jane Doe 3's immigration status, it was over a decade later, and Ms. Bronfman hired lawyers to facilitate Jane Doe 3's companionship with a dying friend. Ms. Bronfman did not, as BOP alleges, facilitate an alleged sexual relation with her co-defendant back in 2003.

54.     The trial transcript and **all** available evidence compels the same conclusion as above regarding Jane Doe 4. Ms. Bronfman and Jane Doe 4 joined NXIVM at about the same time; therefore, Ms. Bronfman could not have "recruited" Jane Doe 4. Even more, that BOP cites the recruitment of Jane Does 2, 3, and 4 as a justification for Ms. Bronfman's PSF offends every notion

of due process and fair play that this country purports to hold dear. *Jane Doe 4, herself, testified at length at Mr. Raniere's trial, and never once mentioned  that Ms. Bronfman knew anything about her or her sisters' (Jane Does 2 & 3) immigration.* No other witnesses in the entire trial testified contrary to this.

### C. The BOP Acted Arbitrarily and Capriciously in Applying a Sex Offender PSF to Ms. Bronfman.

55.     Pursuant to 18 U.S.C. § 4801, the BOP must organize the "Federal penal and correctional institutions … [to] assure the proper classification and segregation of Federal prisoners *according to the nature of the offenses committed*, the character and mental condition of the prisoners, and such other factors as should be considered in providing an individualized system of discipline, care, and treatment of the persons committed to such institutions." (emphasis added).

56.     Further, as with all other federal government agencies, the BOP must abide by its own published policies and regulations. *E.g.*, *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266-67 (1954); *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 130 (2d Cir. 2020) ("Under deeply rooted principles of administrative law, not to mention common sense, government agencies are generally required to follow their own regulations.").

57.     The BOP's inmate security classifications are governed by the Program Statement. The Program Statement was last updated on September 4, 2019, in light of the passage of the FIRST STEP Act, 18 U.S.C. § 3632. In relevant part, the Program Statement allows for the application of the sex offender PSF only where "official documentation[] ***clearly indicates***" (emphasis added) that the inmate engaged in one of a few enumerated actions, including "(1) [e]ngaging in sexual contact with another person without obtaining permission to do so …; (2) [p]ossessing, distributing or mailing child pornography or related paraphernalia; (3) [a]ny sexual contact with a minor …; [or] (4) [a]ny sexual act or contact … that is aggressive or abusive in

nature." A true and correct copy of the relevant portions of the Program Statement is attached hereto as Exhibit I.

58.     Though the BOP appears to have relied on the PSR to apply the sex offender PSF to Ms. Bronfman, a responsible reading of the PSR could not, consistent with the requirements of the Program Statement, lead to the application of the PSF as to Ms. Bronfman.

59.     While it is true that the PSR discusses sexual offenses (to which Ms. Bronfman objected), however, all references to such offenses are directed at Ms. Bronfman's co-defendants. Ms. Bronfman was never convicted *nor accused of* any such crimes. As described above, Judge Garaufis made it "crystal clear [that] Ms. Bronfman was not convicted of" the same crimes as her co-defendants, crimes that included charges of conspiracy to commit sex trafficking. Ex. A at 7. That Ms. Bronfman was not convicted of engaging in any acts in furtherance of that conspiracy is proof positive that she had nothing to do with the sexual offenses allegedly perpetrated by her co-defendants. *In fact, she knew nothing about them.*

60.     Moreover, although the PSR states that Ms. Bronfman and two co-defendants "participated in efforts to recruit and secure immigration status for non-citizens," the PSR critically goes on to say that such efforts were undertaken so that the non-citizens "could work in one or more NXIVM-affiliated organizations *or* [] become sexual partners for Raniere." Ex. B at 7 (emphasis added). The BOP appears to have read the above text in the PSR without noticing the critical "or" included in the quoted sentence, and arbitrarily concluded that Ms. Bronfman participated in securing immigration status for non-citizens "so that they could become sexual partners for a co-defendant." Ex. D.  This is absolutely not true.

61.     The BOP's interpretation, which is counter to both the judgment of Judge Garaufis and a rational understanding of the plain language of the PSR, is clearly an error. To be clear, Ms.

Bronfman admittedly took steps to secure immigration status for an individual who would work "in one or more NXIVM-affiliated organizations." Ex. B ¶ 21. ***This individual was not Jane Does 2, 3, or 4, as the BOP appears to indicate in its BP-9 and BP-10 Administrative Remedy Appeal responses***. Further, Ms. Bronfman ***did not*** act to bring people into this country to become sexual partners for Mr. Raniere—including Jane Does 2, 3, and 4—nor was she ever accused of such misconduct.

62.   It is therefore clear that "the determination made by the BOP, from nothing more than the language of the PSR," to apply the PSF to Ms. Bronfman is arbitrary and capricious. *See Stafford v. Pratt*, No. CIV. A 3:01-CV-0035-M, 2001 WL 548898, at *3 (N.D. Tex. May 22, 2001). As in *Stafford*, the BOP has misinterpreted, and continues to misinterpret, Ms. Bronfman's PSR. For the BOP to tag Ms. Bronfman with a sex offender PSF based on the description of the convictions of her co-defendants, which Judge Garaufis concluded she knew nothing about and are far afield from her own activity, therefore violates 18 U.S.C. § 4801 and the Program Statement and is manifestly unfair, arbitrary, and capricious.

### D. The FIRST STEP Act.

63.   In the FIRST STEP Act, Congress provided that a prisoner was ineligible for the program if they are "serving a sentence for a conviction under any of the following provisions of law" and lists some sixty-eight offenses. 18 U.S.C. § 3632(d)(4)(D). Ms. Bronfman is *not* "serving a sentence for a conviction under any" of them, including the number that relate to sexual abuse or misconduct, e.g., 18 U.S.C. § 3632(d)(4)(D)(xxxvii)-(xxxvix), (li).

64.   Ms. Bronfman's sentencing is for her conviction under 8 U.S.C. § 1324(a)(1)(A)(v)(1) ("Conspiracy to Conceal and Harbor Illegal Aliens for Financial Gain") and 18 U.S.C. § 1028(a)(7) ("Fraudulent Use of Identification"), as alleged in the Superseding Information to which she plead guilty in the EDNY (EDNY ECF No. 943).

## COUNT I
### *Accardi* Violation

65.     Petitioner repeats and re-alleges Paragraphs 1 through 43 as if set forth fully herein.

66.     Petitions for writs of habeas corpus that, like Ms. Bronfman's, challenge "the *execution* of a federal prisoner's sentence, including such matters as the … type of detention and prison conditions," are appropriate pursuant to 28 U.S.C. § 2241(a). *E.g.*, *Jiminian v. Nash*, 245 F.3d 144, 146 (2d Cir. 2001) (emphasis in original).

67.     Under the principles set forth by the United States Supreme Court in *Accardi v. Shaughnessy,* 347 U.S. 260 (1954), the BOP must follow its own regulations.

68.     The BOP's failure to follow its own regulations constitutes a violation of Ms. Bronfman's Due Process rights. *Accardi*, 347 U.S. at 266-67; *see also Stafford*, 2001 WL 548898 at *1 ("[T]he BOP is bound to apply [its] regulations, and its failure to do so can create a due process violation where, as here, prejudice to the Petitioner results.").

69.     Ms. Bronfman did not engage in any conduct that would support the application of a PSF designation under 18 U.S.C. § 4801 and/or the Program Statement.

70.     BOP's application of the sex offender PSF designation to Ms. Bronfman is not supported by any "official documentation" that "clearly indicates" that Ms. Bronfman has engaged in any of the conduct described in the Program Statement requisite for the application of the PSF.

71.     BOP's decision to apply the sex offender PSF to Ms. Bronfman violates the *Accardi* principle because the BOP did not follow even its own rudimentary regulations and instead applied the PSF in an arbitrary and capricious manner in abuse of its discretion to assign public safety factors to incarcerated individuals like Ms. Bronfman.

72.     Additionally, BOP's failure to follow its own policies, resulting in the arbitrary and capricious application of the sex offender PSF to Ms. Bronfman, has unconstitutionally prejudiced her.

73.     Because of the PSF, Ms. Bronfman is not eligible for designation to a minimum-security facility or for release under the First Step Act. Among other things, minimum security facilities "are work- and program-oriented;" low security facilities, such as the one in which Ms. Bronfman is currently housed, are not. Ms. Bronfman is also automatically disqualified from designation to a CCC and eligibility for the CARES Act, as a result of the sex offender PSF.

74.     This prejudice, arising as a result of BOP's failure to follow its own policies, gives rise to a violation of Ms. Bronfman's Due Process rights to equal protection under the law pursuant to the Fifth Amendment to the U.S. Constitution. *Stafford*, 2001 WL 548898 at *1.

75.     In light of the foregoing, Ms. Bronfman is entitled to a writ of habeas corpus directing Respondents to remove the sex offender PSF as applied to her.

## PRAYER FOR RELIEF

**WHEREFORE**, Petitioner-Plaintiff Clare Bronfman respectfully requests the following relief:

(1)     Pursuant to 28 U.S.C. § 2243, the issuance of a writ of habeas corpus directing Respondents to remove the sex offender PSF applied to Petitioner;

(2)     All additional and further relief that this Court may deem just and proper.


Dated: July 5, 2022                      Respectfully submitted,

                                         **LAW OFFICE OF MICHAEL L.
                                         CHAMBERS, JR.**


                                         By: __/s_____
                                              Michael L. Chambers (CT Bar No. ___)

                                              Law Office of Michael L Chambers Jr.
                                              2 Congress St
                                              Hartford, 06114
                                              michael@mchamberslaw.com

                                         **RONALD SULLIVAN LAW, PLLC**

                                              Ronald S. Sullivan Jr.
                                              (*pro hac vice* forthcoming)
                                              1300 I Street, N.W., Suite 400 E
                                              Washington, D.C. 20005

                                         **LEVIN & ASSOCIATES, PLLC**

                                              Duncan Levin
                                              (*pro hac vice* forthcoming)
                                              44 Court Street, Suite 905
                                              Brooklyn, New York 11201
                                              Tel.: (212) 330-7626
                                              dlevin@levinpllc.com

                                              *Counsel for Petitioner-Plaintiff Clare
                                              Bronfman*

## **<u>Certificate of Service</u>**

Counsel hereby certifies that a copy of the foregoing was mailed to Respondents and counsel for Respondents and the following addresses:

Warden Timethea Pullen

FCI Danbury

33 1/2 Pembroke Station

Route 37

Danbury, CT 06811

United States Attorney's Office

New Haven Office

Connecticut Financial Center

157 Church Street , Floor 25

New Haven, CT 06510