UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - x
                         :

CLARE BRONFMAN,              :  No. 3:22CV838(JAM)
                         :

      Petitioner-Plaintiff,  :
                         :

      v.                  :
                         :

TIMETHEA PULLEN, in her official  :
capacity as Warden of FCI Danbury;  :
FEDERAL BUREAU OF PRISONS; BRYAN  :
ANTONELLI, in his official  :
capacity as Acting Regional  :
Director of the Federal Bureau of  :
Prisons' Northeast Region; MICHAEL :
CARVAJAL, in his official capacity :
as Director of the Federal Bureau  :
of Prisons,                 :
                         :  New Haven, CT
      Respondents-Defendants. :  October 4, 2022
                         :
- - - - - - - - - - - - - - - - - x

ORAL ARGUMENT

B E F O R E:

THE HONORABLE JEFFREY ALKER MEYER, U.S.D.J.

Diana Huntington, RDR, CRR
Official Court Reporter

```
 1   A P P E A R A N C E S:

 2

 3        FOR THE PLAINTIFF:

 4            HARVARD LAW SCHOOL
                  Griswold 210
                  Cambridge, Massachusetts 02138
 5            BY:  RONALD S. SULLIVAN, JR., ESQ.

 6

 7        FOR THE DEFENDANTS:

 8            OFFICE OF THE UNITED STATES ATTORNEY
                  157 Church Street, 25th Floor
                  New Haven, Connecticut 06510
 9            BY:  NATALIE NICOLE ELICKER, AUSA

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                      **2:10 P.M.**

2              THE COURT:  We're here today for argument on

3    motion to dismiss in the matter of Bronfman v. Pullen.

4              Appearance of counsel, please, for the

5    petitioner.

6              MR. SULLIVAN:  Good afternoon, Your Honor.

7    Ronald Sullivan on behalf of the petitioner Clare

8    Bronfman.

9              THE COURT:  Good afternoon.  I understand

10   Ms. Bronfman may be listening in, possibly --

11             MR. SULLIVAN:  Ms. Bronfman is on the telephone.

12             THE COURT:  -- from FCI Danbury.

13             Ms. Bronfman, can you hear us?

14             MS. BRONFMAN:  Yes, Your Honor, I can.  Thank

15   you.

16             THE COURT:  Great.  All right.

17             And for the government.

18             MS. ELICKER:  Thank you, Your Honor.  Natalie

19   Elicker with the U.S. Attorney's Office for the

20   respondents.

21             THE COURT:  And Mr. Nelson is here as well.

22   Terrific.

23             So I think, perhaps, since it's your motion,

24   Ms. Elicker, if you might like to proceed.  I don't know

25   if there's anybody else on Zoom we need to acknowledge as

```
 1    being part of the proceedings.
 2            MS. ELICKER:  Not on behalf of defendants.
 3            MR. SULLIVAN:  No one else is here.  I think
 4    it's our petition.  We're in the unique position where the
 5    government is on the other side.
 6            THE COURT:  I was a little unclear.  Did you
 7    want to go first; is that what you're telling me?
 8            MR. SULLIVAN:  I'm happy to go first.  We're the
 9    moving party.  Whatever Your Honor wants.
10            THE COURT:  I guess you're the moving party in
11    the sense that you filed the petition.  I get that.  Then
12    again, Ms. Elicker filed a motion.
13            Is it okay with you, Ms. Elicker, for
14    Mr. Sullivan to begin?
15            MS. ELICKER:  I'm prepared to go first, but it's
16    also perfectly fine.
17            THE COURT:  Maybe since it's the claim he's
18    seeking relief, maybe I'll hear from Ms. Bronfman's
19    counsel first.  Of course, I'll give you every opportunity
20    to make all responses you like.
21            MS. ELICKER:  Thank you.
22            THE COURT:  Please proceed, Mr. Sullivan.
23            MR. SULLIVAN:  Thank you, Your Honor.  Is it
24    your preference that I do it from here or at the podium?
25            THE COURT:  Wherever you're comfortable.
```

1          MR. SULLIVAN:  Your Honor, I want to accomplish

2     three things: (1) I want to talk about what may appear to

3     be a doctrinal tension, but I don't think that one

4     actually exists; (2) I want to narrow the arguments, and

5     that's one of the reasons I wanted to go first, because I

6     think I could make the Court's job easier because we in

7     fact agree on more than we disagree on; and then (3) the

8     Court will be happy, I know the Court has read everything,

9     I am not want to regurgitate arguments that the Court has

10    already read, but I'll offer a brief summative statement

11    of our arguments.

12          THE COURT:  Sure.

13          MR. SULLIVAN:  So having read the papers,

14    Your Honor, again, on a cursory glance it can look like

15    two doctrinal ships sort of passing, each side saying

16    different propositions.  So the one doctrinal thread I'll

17    call the *Vega* thread, and it stands for the proposition

18    that wrongly classifying someone as a sex offender

19    implicates constitutionally protected liberty interest.

20    The second doctrinal thread that the government asserts,

21    we can call it the *Moody* line of cases, stands for the

22    proposition that prisoners have no protected liberty

23    interest in classification.  Both things can be true and

24    indeed are true.

25          Ms. Bronfman refined her argument in the reply

1    in light of the government's 12(b)(6) argument where we

2    stated that the constitutionally protected interest that

3    we are litigating is the interest with respect to being

4    wrongly classified as a sex offender, not the

5    classification system writ large.  That's the *Moody* line

6    of cases.  Ours is the *Vega* line of cases.  And I would

7    say more of that in a bit, but I just wanted to --

8                THE COURT:  If I take you at your word on that,

9    and I'm very interested in hearing from both sides about

10   *Vega*, essentially it's a stigma plus argument, right?

11               MR. SULLIVAN:  Stigma plus, correct.

12               THE COURT:  The stigma plus claim, it seems to

13   me it's different than an *Accardi* claim.

14               MR. SULLIVAN:  Yes.

15               THE COURT:  An *Accardi* claim basically is you

16   didn't follow your own regulations, and that's that.  You

17   should have followed them.  And there was an underlying

18   liberty interest.  And so the government loses.  That's an

19   *Accardi* claim.

20               The stigma plus claim that you're raising here,

21   it seems to me, or pushing right now, is based upon the

22   fact that your client is effectively being classified as a

23   sex offender, in your view, for the public safety factor

24   analysis.  And so I get that.  I get the way that you look

25   at those differently.  I have questions about that.

1          MR. SULLIVAN:  Yes.

2          THE COURT:  Probably the first question I have

3    is you filed a habeas corpus petition that doesn't allege

4    a stigma plus theory, does it?

5          MR. SULLIVAN:  Well, it's clarified in the reply

6    brief.  So the answer to that is yes.  We talk about

7    stigma qua stigma in the original petition, and we clarify

8    stigma plus in the reply brief.

9          THE COURT:  I get it.  I get it.  But the

10   petition is usually kind of the controlling allegations

11   document, right, and the briefing is just the -- well,

12   it's an argument, right?

13         MR. SULLIVAN:  We do say stigma in the original

14   brief.  And we argue the plus.  Correct, we don't use the

15   word "stigma plus," but both are there.

16         THE COURT:  Got you.

17         So what's the plus?  Let's say I take you up on

18   your suggestion that it's stigma.  What's the plus?

19         MR. SULLIVAN:  So there are several pluses.  So

20   the pluses have to do with the inability to take advantage

21   of the FIT program -- I'll say more about the late-filed

22   brief; I saw the Court's head pop up -- the CARES Act

23   program; the CCC, the community placement program; and

24   also the FIT, F-I-T, program that Ms. Bronfman is required

25   to participate in.

1          Now, I realize the government filed a second

2     opposition brief out of time that they call a reply brief.

3     Usually the moving party gets the last word, but we didn't

4     attempt to file another brief.

5          Now, in that brief they say, well, we don't know

6     where you got this idea that she's ineligible for the

7     first act program.

8          THE COURT:  First Step Act.

9          MR. SULLIVAN:  First Step Act.

10          Then in a footnote says, well, we classified her

11     as ineligible.  So I submit to the Court, well, that's

12     where we got the idea from, from the government itself.

13          THE COURT:  But they changed it today.  And I'm

14     sure Ms. Elicker will --

15          MR. SULLIVAN:  And they changed it on the day

16     they filed the brief.

17          Now, there are -- and I can supplement if the

18     Court wants.  There's doctrine in this circuit as well as

19     other circuits across the country that stand for the

20     proposition that a last-minute change like this doesn't

21     cure the problem when the problem existed at the time it

22     was alleged.  And I'm happy to just file a letter brief,

23     if this Court allows a letter brief, to send those cases

24     to the Court.  So we don't think that's a problem.

25          The halfway house, the government doesn't deny

1   that that is a plus.

2          And if we have the opportunity to respond to the

3   opposition/reply brief, we would have added that

4   Ms. Bronfman is being required to participate in something

5   called the FIT program at Danbury.  And the FIT program is

6   a program that purports to remedy the underlying

7   conditions that led to a sexual offense, which we deny and

8   there is absolutely no evidence of.  So that's a plus.  So

9   we think the Court can find a plus in any number of

10  things.

11          THE COURT:  But you've filed a response, though,

12  telling me you want me to grant the habeas corpus right

13  now.  It sounds like I need to do some fact finding.

14          MR. SULLIVAN:  That is -- we don't think you do.

15  We think that enough is there.

16          THE COURT:  So I can just take your word that

17  she's having to participate in the FIT program.  You never

18  said anything about it in any of your papers.

19          MR. SULLIVAN:  In fairness, Your Honor, the

20  government changed the landscape in a late-filed brief.

21  We would have stood on the First Step Act, but they added

22  something late.  And I'm happy to do yet another brief

23  with the FIT program.  But I'm simply responding to that.

24          But the CCC, the halfway house, ineligible

25  because of this PSF.  That's one that the government, as I

1    read their papers, they don't dispute.  So that's enough

2    there.

3           I'd ask the Court to accept my representation on

4    the FIT program.  I don't think the Bureau of Prisons will

5    deny that she's being required to participate in the FIT

6    program when this cycle starts, I believe it's November.

7    But that's why she's at Danbury in that particular low

8    facility.  So we think that is the plus.

9           You know, the Court has already told you you

10   don't have to do an independent analysis.  The Second

11   Circuit has already said that stigma can be a protected

12   liberty interest.  Or with respect to the claim or label

13   of a sexual -- the label of a sexual offender can't

14   implicate a protected constitutional interest.  So that's

15   there.

16          You yourself in a different context has endorsed

17   the stigma plus idea.

18          So this is a different context.  So the

19   government says, well, that was defamation.  This is the

20   point.  The constitutionally protected interest is a

21   constitutionally protected interest.  In the defamation

22   context, it's the way a normal state law claim comes into

23   federal court.  It's the same constitutionally protected

24   interest.  In the habeas context, it's a constitutionally

25   protected interest that gives Your Honor the authority and

1    the jurisdiction to rule.  So it's the same -- the nature

2    of the case doesn't change the constitutionally protected

3    interest.  It is -- that is the interest.  I'm aware of no

4    authority in any court that says that the basic nature of

5    a constitutionally protected interest changes the context.

6    That would be an incorrect way to look at it.  The

7    interest is the interest.  Now, how that interest

8    interacts with the particular context, completely

9    different story.  But the interest is the interest.

10           We submit that the interest is there.  The Court

11   has enough evidence of the interest.  And you have the

12   plus.  Even without the adding of the FIT program, which

13   I'm happy to do.

14           THE COURT:  Well, let me talk a little bit more

15   about the plus side.  And then I want to come back to

16   stigma, if I can.

17           MR. SULLIVAN:  Yes.

18           THE COURT:  On the plus side, it seems that you

19   say that she loses eligibility for certain benefits such

20   as the halfway house, such as -- I'm not sure exactly what

21   benefit you're alleging as to the CARES Act.  Is that some

22   sort of early release?

23           MR. SULLIVAN:  Yes, Your Honor.

24           THE COURT:  And how far is she in her sentence

25   right now?

```
 1              MR. SULLIVAN:  Two years.

 2              THE COURT:  She's two years in.  And she

 3  received a sentencing of 81 months, I think, from

 4  Judge Garaufis.

 5              MR. SULLIVAN:  Correct.

 6              THE COURT:  Is this ripe?

 7              MR. SULLIVAN:  Absolutely it's ripe.  Because

 8  until September 26 she was told by BOP that she was

 9  ineligible for the First Step Act and those calculations

10  were not done, which they should have been done and should

11  have been done concurrent with the sentence.  Absolutely

12  ripe.  She has been -- she's in Danbury and scheduled to

13  start the FIT program in November.  It's absolutely ripe.

14  She is at this point in time ineligible for the halfway

15  house.  It is absolutely ripe.

16              So she has lost --

17              THE COURT:  Can you stop you for a second?

18              MR. SULLIVAN:  Yes.

19              THE COURT:  Would she be eligible this year or

20  even next year to go to a halfway house?  I assume not.

21              MR. SULLIVAN:  I think in -- she would certainly

22  be eligible for the First Step Act I think would kick

23  in -- so the question is interesting, Your Honor.  Because

24  if she were -- it's a counter-factual.  If they calculated

25  the First Step Act, as they should have, without this
```

1    unconstitutional PSF, then in a year's time I believe

2    those benefits will have accrued.  So the question is that

3    from --

4              THE COURT:  What are those benefits?

5              MR. SULLIVAN:  -- the time they start, they

6    start accruing.  She should have had some number of months

7    X.  And she has zero now.  And that is a plus.

8              THE COURT:  I see.  So she's not able to

9    accumulate month-by-month benefits towards early release?

10             MR. SULLIVAN:  Correct.  Or CC house

11   eligibility.  So we think that is sufficient as a plus.

12             THE COURT:  On the plus side.

13             And the FIT program, is it specifically sexual

14   offender treatment?

15             MR. SULLIVAN:  With her, it is.  I'm not sure

16   how broad the mandates of the program are.  In her unit

17   there are several people convicted of different forms of

18   sexual acts, and her particular treatment program has to

19   do with a sexual offense, which is going to be difficult

20   because she didn't commit one.  And the nature of these

21   programs are you have to admit to what you've done and so

22   forth.  And there's nothing here to admit to.

23             THE COURT:  I see.

24             So if we look, *Vega* talks about the -- now I'm

25   going to shift my questioning towards the stigma side.

1      And *Vega* talks about how the stigma plus claim relies upon

2      it says "the utterance of a statement sufficiently

3      derogatory" that's, of course, capable of being proved

4      false.  And I understand your arguments why you believe

5      it's false.  I guess I'm wondering about what is exactly

6      the statement that's being uttered here.  You referred to,

7      for example, my prior decision in *Hill v. Tyburski* which

8      you cite in your briefing where we actually had an inmate

9      who was being accused out loud by prison guards of being a

10     deviant sexual offender and the like.  This seems

11     different to me.  It seems like it's more that the BOP,

12     for its own internal calculation purposes within its own

13     records, has assigned or designated a PSF factor on this

14     basis.  It doesn't seem like -- maybe you have something

15     to the contrary, you know, that they're printing it out

16     and posting it on the bulletin board in the cafeteria in

17     Danbury so that everybody knows and thinks that this is a

18     sexual offender.  What's the statement here?

19              MR. SULLIVAN:  The statement is that she is a

20     sexual offender.  Here, I will borrow from the

21     government's brief and reach ahead to my next bullet

22     point.

23              THE COURT:  Okay.

24              MR. SULLIVAN:  We don't agree.  The government

25     makes this claim about are we making a distinction between

1    epistolary contacts and other contacts.  So my -- and

2    we're not doing that.  My argument is that, you know,

3    there can be an epistolary utterance in a piece of paper

4    that calls Ms. Bronfman a sex offender and that that is

5    sufficient under *Vega* and *Vega*'s progeny.

6               THE COURT:  Which one was that?

7               MR. SULLIVAN:  I'm sorry?

8               THE COURT:  Where is that?

9               MR. SULLIVAN:  That's in her PD9, PD10, PD11,

10   and PD12.  These are the bureau of prison administrative

11   appeal documents that --

12              THE COURT:  They're the response to your

13   complaint, right, about her having a PSF?

14              MR. SULLIVAN:  They are -- yes, BOP's

15   justifications for the PSF.  So they're there.

16              THE COURT:  Right.  I get that.  But I'm

17   wondering, because I thought you were complaining not

18   about what they said later on -- and certainly I'm not

19   sure I see that as the basis for your claim.  I thought

20   your claim was she's wrongly classified for PSF purposes.

21   And I'm wondering what is the statement there that's made

22   as to the classification itself apart from the later

23   defenses of the classification which presumably the BOP

24   has to do to defend the classification.

25              MR. SULLIVAN:  Well, the chronology, Your Honor,

1    is a little different.  The classification came first, the

2    PSF.

3            THE COURT:  That's what I mean.

4            MR. SULLIVAN:  BOP made an utterance that she's

5    a sex offender because they classified her with this PSF

6    on sex offense grounds.  And I was not the trial lawyer,

7    but I was the lawyer at sentencing and on appeal.  And I

8    actually filed a FOIA and had to get some of this

9    information.  So we learned that the basis was a sexual

10   offense.  We think that is an utterance.  If that's not

11   convincing to Your Honor, then the FIT program, there's an

12   affirmative utterance there that you are a sex offender in

13   need of treatment, that is why you are in the FIT program

14   and I think, even under what I take Your Honor's question

15   to be gesturing at, would satisfy the Court.

16            I should say one more thing.  These are group

17   counseling sessions in the FIT program.  So it is public

18   in that sense.  The information we received from FOIA is

19   public.  Anybody, your clerk, your law clerks could file a

20   FOIA and here it is the United States government uttering,

21   calling Ms. Bronfman a sex offender when substantively,

22   factually, it is absolutely 100 percent untrue, and that's

23   demonstrable and provable.  I know my language now is

24   gesture at substitute due process, this is what makes it

25   all the more frustrating when through the period of the

1  better part of a year the Bureau of Prisons told

2  Ms. Bronfman that you engaged in sexual acts with Jane

3  Does 2, 3, and 4, when it wasn't true.  It was impossible.

4  So either of what I listed strikes me as an utterance

5  sufficient to satisfy what you point out --

6              THE COURT:  Let me --

7              MR. SULLIVAN:  -- I'm sorry, in *Vega* and *Hill*.

8              THE COURT:  Let me just make sure I'm

9  understanding your argument.

10              Your argument is simply the fact of the

11  classification using a PSF factor that's based on the

12  BOP's belief that she's a sex offender, that itself is a

13  statement.

14              MR. SULLIVAN:  That is one of the statements.

15              THE COURT:  You believe that's a statement.

16              MR. SULLIVAN:  Yes.

17              THE COURT:  And to whom was it made?

18              MR. SULLIVAN:  It was made to Ms. Bronfman.  It

19  has made to the -- oh, I'm forgetting the names, but the

20  unit managers, for lack of the correct name, in the prison

21  systems for Ms. Bronfman.  Those folks, her case manager,

22  they are told of this classification.

23              THE COURT:  I see.

24              MR. SULLIVAN:  And really the public, if the

25  public asks.

1          THE COURT:  Oh, really?  The BOP has a website

2    where --

3          MR. SULLIVAN:  I filed a FOIA because we

4    couldn't figure out why she got this PSF.  But I'll rest

5    on the internal personnel at the prison, so that's one.

6    And then the people with whom she will be forced to talk

7    about things she didn't do with a group of prisoners.

8    That seems to me all square with Your Honor's concern

9    about it being sort of public out there.  No, it's not on

10   a BOP website.  And I don't mean to suggest that.  I can't

11   Google it and get that.  I don't want to overstate.

12          THE COURT:  Were you able to get it through

13   FOIA?

14          MR. SULLIVAN:  Yes.  We were able to get it

15   through FOIA.

16          THE COURT:  All right.  You mentioned

17   substantive due process.  You're raising a procedural due

18   process claim here, right?

19          MR. SULLIVAN:  I'm raising procedural due

20   process.

21          THE COURT:  I just want to make sure there's not

22   new claims slipping in the back door here that aren't

23   alleged.

24          MR. SULLIVAN:  I just noticed my vocabulary was

25   tending toward substantive due process, but that's not our

1    claim here.  We rest on our claim here.

2              THE COURT:  I see.  What else?

3              MR. SULLIVAN:  I thought it might be -- well,

4    I'll just mention with respect to this Court's holdings at

5    *Hill* and *Notz*, if I'm pronouncing that correctly.

6              THE COURT:  *Notz*.  It's on appeal.  It may not

7    last very long, we'll see.

8              MR. SULLIVAN:  We shall see.

9              Those were listed that included for the limited

10   purpose that even this Court affirms the basic principle

11   of stigma plus analysis.  Obviously they are in a

12   different context.

13             As I mentioned earlier, stigma qua stigma is

14   stigma.  That doesn't change.  That is immutable.  How you

15   do the analysis in different parts, different sorts of

16   claims is a different story.

17             Your Honor, very briefly, the second thing I

18   want to do is narrow the argument or attempt to narrow the

19   argument.  The government in its initial brief at 15 makes

20   the claim that BOP's application of the sex offender PSF

21   to petitioner is appropriate even without a sex offense

22   related conviction.  We absolutely agree.  And we never

23   said otherwise.

24             Our mention of the absence of a sex offender

25   agreement simply meant this.  If she were convicted of a

1    sex offender offense, I wouldn't be here.  In the absence

2    of that, they have to show a sex offender.  That's all we

3    said in our brief.  We absolutely agree with the

4    government there.  And that was their only other argument

5    besides what I'll call the jurisdictional argument.

6            Then in the second opposition brief the Court --

7    I'm sorry, the government alleges that the first is that

8    the Court is not limited to the PSR.  No disagreement.  No

9    disagreement.  They can look far and wide and they will

10   not find an instance of Miss Clare Bronfman engaging in

11   sexual offense.  Our point was only that you said that you

12   used the PSR to come to your decision and you were

13   absolutely provably wrong.  And there's nothing else they

14   can point to.

15           THE COURT:  Did you file the final PSR?

16           MR. SULLIVAN:  I saw the note.  I didn't see

17   that Ms. -- yes, there is another filing there.  I don't

18   think it's substantively different than anything else.  I

19   don't have any objection if the Court wants to look at it.

20   I thought it's in the possession, custody, and control of

21   the government.  If BOP can't share, I take them at their

22   word.  They never said they relied on that document,

23   though.  Not sure how it's helpful, but if -- I don't know

24   what the restrictions are.  It's a sealed document.  We

25   filed a motion to seal to put the PSR in evidence.

1          THE COURT:  Can't see why you wouldn't.  If you

2     put in an earlier version of the PSR, why not put the

3     final version in?

4          MR. SULLIVAN:  No particular reason, Your Honor.

5     We're happy to have that submitted.  Again, I don't think

6     there was any substantive change.  We relied throughout

7     the sentencing on the one that I sent.  He took a couple

8     things out, I believe.  But nothing to hide here.

9          THE COURT:  Great.  Okay.

10          MR. SULLIVAN:  Very welcome to look at it.

11          THE COURT:  I'll look forward to that.

12          MR. SULLIVAN:  So then the government states

13     that -- so no dispute there; take that off the Court's

14     plate -- that we misread the program statement.  So here

15     is where the government says that we appear to disagree

16     with BOP that BOP can consider epistolary contacts to be

17     contacts and we're urging the Court to rule that contacts

18     are only physical contacts.  No, we're not doing anything

19     of the sort.

20          They spill a lot of ink talking about a letter,

21     some letters that a lawyer wrote a behalf of Ms. Bronfman.

22     We agree that there is such thing as an epistolary sexual

23     contact.  What we think has to be an essential feature of

24     it is it has to be something about sex.  These letters had

25     to do with intellectual property.  These letters had to do

1   with lists.  Under Mexican law -- and nobody has disputed

2   and the government cannot dispute that taking those lists

3   under Mexican law -- this all happened in Mexico -- was

4   illegal, and they wrote letters saying that's illegal, we

5   want our lists back.  Nothing at all about sex in those

6   letters.

7           Here's why this is important.  Then the

8   government says that we ask the Court to draw a

9   distinction between communications that are mean and those

10  that are aggressive and intimidating.  Again, we did

11  nothing of the sort.  You can write a mean letter, you can

12  write an intimidating letter, you can write an aggressive

13  letter.  If you want to put a sex offender tag on it for

14  that, we may be back in here on a First Amendment claim in

15  the absence of some reference of sex or innuendo of sex.

16  That is absolutely not the case with these letters.  And

17  I'm a bit confused about the argument.

18          So what the government does then is says that

19  skipping over their own Regulations 1, 2, and 3, they go

20  to Regulation 4 and just mention the part about

21  intimidating or aggressive.  What the Regulation 4 says --

22          THE COURT:  Isn't it aggressive or abusive?

23  Isn't that the terminology?

24          MR. SULLIVAN:  I defer to the Court.  In either

25  case, it doesn't change what I'm about to say is that the

1    Regulation Number 4 says sexual contact that is

2    intimidating or abusive or aggressive, whichever the

3    correct word is.

4           THE COURT:  That's not actually what it says.

5    That's not what it says, does it?  The actual terminology

6    is "any sexual act or contact."

7           MR. SULLIVAN:  Yes.  And I submit there's

8    neither an act nor a contact that the aggressive and

9    intimidating or aggressive and abusive modifies sexual

10   contact and act.  You can't wrench that out of context and

11   say anything that's intimidating or abusive falls under

12   Number 4.  So there's not been a sexual contact.  There's

13   not been a sexual --

14          THE COURT:  Act.

15          MR. SULLIVAN:  -- act that was -- so these are,

16   you know -- what do you call it? -- predicate nominatives,

17   I think, that are not abusive or intimidating, mean.  Put

18   any sort of descriptor there, it modifies sexual act or

19   contact.

20          And just very briefly on that, Your Honor, so we

21   also allege that the government creates -- well, let me

22   stay on task.

23          So with that one, the government also cites

24   *LaSorsa*, if I'm pronouncing that case right, in this

25   second brief in service of their point that they're not

1   limited to what they said they were basing it on.  And

2   there's some language in *LaSorsa* that says that you can

3   have some flawed reasoning in the administrative process

4   but you can fix it essentially here in a habeas petition.

5        I submit to the Court that this is not flawed,

6   the reasoning; that it was just wrong.  They made a

7   horrendous mistake that has impacted the life of a woman

8   who did not engage in any sexual contact or act with

9   anyone.  So it's just wrong.

10       Now, *LaSorsa* is an important case because we

11  cite it too.  And I think that it is an example of my

12  earlier claim that these two doctrinal threads can be read

13  together, that we can harmonize these two doctrinal

14  threads.

15       Later on in *LaSorsa* on 559 the -- I'm sorry,

16  that's where the government cites.  I should say earlier

17  in *LaSorsa* at 556 the Court -- and this is Southern

18  District Court, it's persuasive authority, obviously not

19  binding on Your Honor --

20       THE COURT:  Is it by somebody named Sotomayor?

21  I can't remember.  I've found her to be fairly persuasive.

22       MR. SULLIVAN:  That's really persuasive.

23       THE COURT:  Yes.

24       MR. SULLIVAN:  And because it's really

25  persuasive, it says at 556 "The Bureau of Prisons has also

1   issued regulations implementing" -- and I'm quoting --

2   "implementing the early-release program.  Although BOP has

3   unfettered discretion under the statute, regulations

4   issued have the force of law and may limit BOP's own

5   discretion further than the statute does.  The Court must

6   therefore analyze the regulations to see if BOP has done

7   so."

8          And this is one of our central arguments that,

9   look, they have these regulations and under these

10  regulations they simply did not follow their own

11  regulations.  And even if the BP9, -10, -11, -12, there

12  may have been a BP13, I can't remember, even if they got

13  it wrong on all of those and they kept saying 2, 3, and 4

14  argument, Jane Does 2, 3, and 4, they didn't cure that in

15  these papers.

16         And I will say this.  I checked.  The government

17  used nearly 8,000 words in their briefs.  And not a single

18  word, not a single word defends their basis for the PSF

19  during the administrative process which lasted a better

20  part of a year.  The government never came out and said,

21  you know, our bad.  We got this wrong.  She was show

22  jumping in Europe when Jane Does 2, 3, and 4 were

23  recruited to Nxivm.  She didn't know them.  Yes, you're

24  right, she could not have recruited them.  And if she

25  didn't recruit them, she could not have facilitated them

1    being engaged in a sexual relationship, including the

2    minor.  It's a mistake.  And that's okay.  We're human

3    beings.  It is a mistake that has really harmed

4    Ms. Bronfman.

5              Your Honor, what their regulations say --

6              THE COURT:  Can I stop you for just a second?  I

7    want to make sure I'm understanding your argument.

8              MR. SULLIVAN:  Yes.

9              THE COURT:  Is it your view that a BOP program

10   statement is a regulation that qualifies under the *Accardi*

11   rule?

12             MR. SULLIVAN:  Yes.  Absolutely.

13             THE COURT:  Are BOP program statements subject

14   to notice and comment?

15             MR. SULLIVAN:  I don't know.  I don't know the

16   answer to that.  I can find it out.

17             THE COURT:  I guess I'm trying to figure out --

18   I haven't gone through all of this.  It occurred to me

19   that I wondered whether it's something that actually is

20   binding upon the BOP in the same way that a regulation

21   that appears in the CFR would be.

22             MR. SULLIVAN:  I think so, yes, Your Honor.  I

23   mean, to find otherwise -- so the *Accardi* principle is in

24   form similar to the last like 70 years of civil rights

25   litigation, right?  You don't have to state X, you don't

1    have to have a public school.  But if you do, you have to

2    follow the rules that you've set.  You don't have to have

3    a public swimming school, but if you do, you can't have

4    one set of rules for this person, one set of rules for the

5    other person.  And it is in that spirit that *Accardi*

6    comes.  That when you create these steps, when you create

7    these procedures, then that gives the individual subject

8    to those procedures a due process interest in them.  I

9    think it's consistent with our law generally, and I don't

10   think that it being subject to public comment is something

11   that would distinguish its applicability to any given

12   petitioner who relies upon those rules.

13        THE COURT:  So what if the warden at Danbury

14   issues a facility-wide mandate that lunch will be served

15   at 12:00 p.m. but then she decides or he decides not to

16   allow people to eat until 12:30, *Accardi* problem there?

17   Due process lawsuit in federal court?

18        MR. SULLIVAN:  Excellent.  Excellent

19   hypothetical.  I feel like I'm back in class now.

20        So at an initial analytical level, yes, that

21   is -- so we're assuming some regulation has issued.  And

22   that's a violation of the regulation.  If I were

23   analyzing --

24        THE COURT:  That's what I'm asking.  What's a,

25   quote, regulation?  I'm wondering does program statement

1    qualify as a regulation?  Or is it more like the

2    facility-wide mandate, the memo that the warden sends to

3    everybody at Danbury?

4          MR. SULLIVAN:  A program statement, yes,

5    qualifies as a regulation.  I'll find the case when I sit

6    down.  Some of these cases actually talk about --

7          THE COURT:  Fair enough.

8          MR. SULLIVAN:  -- program statements in the

9    context of this analysis.

10          And if we were using this lunch analysis -- so

11   this not a program statement, this is just a memo?

12          THE COURT:  Yes.

13          MR. SULLIVAN:  So I don't know about memos.  But

14   if it were a program statement, then we'd have to find

15   some constitutionally protected interest in the statement

16   or some other constitutionally protected interest.

17   There's probably not one in food, but we'd have to look at

18   it.

19          So there's a case, and I believe it's this

20   jurisdiction where -- yes, it is.  It had to do with

21   Brooklyn, the facility in Brooklyn.  And the warden kept

22   changing the times for attorney visits.  And the argument

23   from the government was that the warden has discretion on

24   this.  And they cited all sorts of fancy laws, warden has

25   discretion.  The Court said hold on, there's a

```
 1    constitutional interest at play here and a Sixth Amendment
 2    right to counsel.  And when you find this constitutional
 3    interest, that cabins and limits the warden's discretion
 4    on certain things.  And this case -- I forget the name of
 5    it, but it will come to me -- this case, there was real
 6    problems here.  There was like a fire or a flood.  And
 7    there was some emergency situations.  The warden wasn't
 8    just willy-nilly saying, geez, I'm not going to allow
 9    attorney visits.  But the Court said we realize that, but
10    there's a constitutional imperative at play.  So when
11    there's a constitutional imperative at play, courts have
12    to be very careful in terms of giving or permitting too
13    much discretion in the government actor in terms of the
14    government actor exercising their discretion.
15            THE COURT:  I take it none of what you're saying
16    walks back the notion that, for purposes of your *Accardi*
17    claim, distinct from the stigma plus argument, you still
18    have to have a predicate liberty interest, right?
19            MR. SULLIVAN:  Our argument is that -- pardon my
20    voice, Your Honor.
21            I think our argument stands under either theory.
22    I think there's an independent due process right created
23    by the BOP in its program statements.  There is another
24    stigma plus argument that can also prevail.  I think we
25    can prevail under either.
```

1          THE COURT:  Okay.  I get that.  But I'm trying

2   to figure out, for purposes of your what I'll call your

3   *Accardi* claim --

4          MR. SULLIVAN:  Yes.

5          THE COURT:  -- don't you have to show as a

6   threshold that there's a liberty interest?  Or is it

7   enough to say, well, the BOP, we footfaulted -- they have

8   a program statement that regulates this.  They violated

9   the program statement, we get to be in federal court.

10          MR. SULLIVAN:  Our position is the -- I think

11   the latter in the list, that it creates an independent

12   cause of action sufficient for this Court to hear a habeas

13   case because it means that in some way this inmate is

14   unlawfully held.  However, the Court doesn't have to

15   scratch its head too much on this because we've got both.

16   We're giving you, wrapped up, both.  So you've got the

17   *Accardi*, you've got the stigma plus.  You can combine

18   them, you can pick and choose.  We are confident that both

19   are sufficient here.

20          But, yes, to answer your question directly, our

21   position is that they create a due process.

22          THE COURT:  Well, a due process right, you

23   understand the basics of any procedural due process claim,

24   number one, you to have an underlying liberty or property

25   interest, right?  Number two, you have to find the process

1    wasn't due.  So you can't collapse them, as I understand

2    it.

3          MR. SULLIVAN:  Right.  And I don't know that I

4    read what we're doing as collapsing them as to say that

5    this liberty interest is violated -- is created and then

6    violated when the government doesn't do what it's supposed

7    to do in a given rule.

8          If the thrust of Your Honor's question is the

9    more correct statement of law, then we still have the

10   liberty interest.  And the liberty interest we'll fall

11   back on is a real liberty interest that is recognized by

12   the Supreme Court and recognized by the Second Circuit,

13   recognized by Your Honor in this Court, and that's the

14   stigma.  So it could be the stigma, it's a liberty

15   interest, plus the *Accardi*.  Or it could be the stigma

16   plus stand-alone on what I call the *Vega* line of

17   questioning, *Vega* line of doctrine.  So I think it can be

18   either or both.  But that there is enough here.

19         If I may, Your Honor, I've been sort of

20   searching for -- and just to make sure this is crystal

21   clear.  So the regulations say -- there are four:  (1)

22   that you have to engage in sexual contact; (2) possessing

23   child pornography; (3) engaging in sexual contact with a

24   minor; (4) engaging in aggressive or abusive sexual

25   contact.  Those are the four areas.

1          And the only argument, as I understand it, that

2    the government adduces in support of its own regulations

3    is that she sent a mean/intimidating/fill-in-the-

4    descriptor letter about violating Mexican law and lists an

5    IP.  If that constitutes aggressive or abusive sexual

6    contact, I think that's a bridge too far, Your Honor, just

7    in terms of just basic at law.

8          THE COURT:  I get that.  I think you've made

9    that argument.

10         MR. SULLIVAN:  Okay.  Very well.

11         THE COURT:  Anything else?

12         MR. SULLIVAN:  So I think, if Your Honor would

13   permit me 30 seconds, I just want to make sure I've got

14   everything out.

15              (Pause.)

16         MR. SULLIVAN:  So unless Your Honor has any

17   additional questions, then I think I've --

18         THE COURT:  Thank you very much.

19         MR. SULLIVAN:  Thank you, Your Honor.

20         THE COURT:  Ms. Elicker.

21         MS. ELICKER:  Thank you, Your Honor.

22         I suppose I could start by saying we certainly

23   didn't mean to intend to be filing a brief out of time and

24   didn't conceive it that way.  Since we filed the motion to

25   dismiss, we took the opportunity to file a reply brief.

1          THE COURT:  I'm not concerned about that.  And

2     I'm somebody who likes to hear as much information as I

3     get.  So if parties want to file more information that's

4     helpful to me making a decision, great.

5          MS. ELICKER:  Thank you.

6          There was an important thing to update in that

7     statement which was that indeed BOP had stated that she

8     was ineligible for the First Step Act previously and then,

9     after reviewing her circumstances, realized that in fact

10    she was eligible.  So there is no legal bar to

11    participating in the First Step Act, all that it entails,

12    simply because you have a PSF.

13         THE COURT:  Okay.

14         MS. ELICKER:  And one reason to start with that

15    is to say, as our brief covered, I think we think that the

16    predicate question for the Court to answer is whether she

17    has articulated a liberty interest.  We did not agree that

18    she has.  And I'm happy to describe the reasons why.

19         One of the questions that Your Honor just asked

20    to opposing counsel had to do with whether the BOP program

21    statement is a regulation that is subject to *Accardi*.  And

22    to that question, I would point Your Honor to I think it's

23    *Pugliese*, P-U-G-L-I-E-S-E, the Second Circuit case that we

24    cited.  That Court found that there, similar to here --

25    the appellees contended that the district court, and the

1    district court held that a policy statement, they alleged

2    that it could create a constitutionally protected

3    interest.  The Court did not agree in part because the

4    policy statement did not in any way limit the

5    Attorney General's discretion to essentially manage the

6    conditions of confinement.  I think that's the same here

7    with respect to the program statement.

8              THE COURT:  I guess I didn't really quite see it

9    maybe in your briefing.  I might have missed it.  Are you

10   saying that a program statement categorically cannot

11   qualify as a, quote, regulation that triggers *Accardi*

12   analysis?

13             MS. ELICKER:  Your Honor, we didn't say that in

14   our briefing and I wouldn't make a categorical argument.

15   Our argument is limited to the program statement here.

16             THE COURT:  I get that.

17             MS. ELICKER:  This one didn't in any way create

18   an expectation in the plaintiff of -- it didn't create the

19   bird in hand that allows her to say that she has a liberty

20   interest when something in it is -- when BOP applies the

21   program statement against her interest.

22             THE COURT:  So let's suppose that a plaintiff,

23   another plaintiff comes along convicted for tax evasion.

24   And the BOP in its wisdom decides to classify the person

25   as a sex offender under the PSF with zero evidence.  But

1    they just decide to do it.  Due process claim there?

2              MS. ELICKER:  Your Honor, your hypothetical is

3    the same one that Attorney Nelson and I were posing to

4    each other --

5              THE COURT:  Oh, well, I'm in good company then.

6              MS. ELICKER:  -- today.  And what I can tell

7    you, we have a partial answer for you.  The first piece of

8    it is that, again, going back to the baseline due process

9    analysis, she has to first have identified a liberty

10   interest.  So in the absence of identifying a liberty

11   interest, our position is that a wrongful application --

12   an application of the PSF that is without evidence, it may

13   be subject to -- like certain courts seem to go into that

14   analysis as we read the case law.  There are cases that

15   seem to address that.  But it's frequently in footnotes

16   and it's frequently in terms of a statement where even if

17   she had alleged a liberty interest or articulated -- even

18   if she had a liberty interest, nevertheless we find that

19   this application doesn't violate the law.  So certainly

20   courts do seem to engage in analysis of whether

21   application of the PSF had evidence.  And in Your Honor's

22   hypothetical, there's no evidence to support it.

23             THE COURT:  Would there be a liberty interest

24   then in that case?

25             MS. ELICKER:  Your Honor, we believe no.  And

1    the reason is -- because, again, it goes back to what's

2    the function of the PSF.  So if application of the PSF

3    required the inmate to go to a maximum security prison,

4    and there's one of the cases in our brief cited to this.

5    If application of the PSF resulted in a deprivation of

6    her -- a deprivation that rose to the level of a liberty

7    interest in the prison context, then absolutely the Court

8    could analyze whether the PSF was rightly applied.  But if

9    getting a PSF means that you eat lunch at 12:30 instead of

10   at 1:00, then we believe that the Court --

11              THE COURT:  So *Sandin* is the guide.

12              MS. ELICKER:  Yes.

13              We believe the Court would not engage in the

14   analysis of whether the PSF was rightly applied.  That

15   doesn't say that the petitioner might not have some other

16   claim against the government.  I don't want to suggest

17   what that could be, but habeas isn't the only relief out

18   there.  If there were some kind of baseless application of

19   this statement, there might be --

20              THE COURT:  What kind of claim?  Now I'm

21   intrigued.  Nobody can sue under *Bivens* anymore.  Those

22   are gone.  You've got, what, a federal tort claims act of

23   some sort?  That doesn't help somebody get out of prison.

24              MS. ELICKER:  True.  True.

25              So the piece that -- sorry, Your Honor.

1            THE COURT:  So maybe if I'll just back it up a

2     little bit here.  I guess I'm trying to come to grips a

3     little bit with it seems to me that Mr. Sullivan has made

4     a pretty convincing case that the BOP made these -- or

5     applied this regulation wrongly, frankly.  And I say

6     regulation, the BOP program statement.  And that they

7     assumed certain facts to be true that were simply I think

8     have been shown not to be true, but I don't see you kind

9     of pushing back on that.  I've -- just let me finish, and

10    I'll give you a chance.  I understand you to say, well,

11    they probably got all that stuff wrong.  Or regardless, if

12    they got that all wrong, you're not going to say that they

13    got it wrong, but regardless if they got it wrong, the

14    letters.  It's these letters.  Later these intimidating

15    letters that are so bad.  And then you're basically saying

16    when those qualify.  And to do that, you don't say that --

17    you've got four criteria under the program statement.  You

18    don't say they meet Number 1, 2, or 3.  You say they meet

19    Number 4, Number 4 being that they constitute, I think,

20    "any sexual act or contact not identified above that is

21    aggressive or abusive in nature."  And it gives examples,

22    which all are examples of sexual acts.

23            So it seems to me your argument really hangs on

24    your own kind of made-up justification for how the BOP

25    program criteria are satisfied because you don't seem to

1    be able to justify and defend what the folks of the BOP

2    actually did.  What am I missing?

3              MS. ELICKER:  Well, so understanding -- I'm not

4    going to repeat myself.  But we would never reach this

5    question --

6              THE COURT:  I get that.  I got your liberty

7    interest argument.  We're going to get to that.  Trust me,

8    okay?  But I'm trying to figure out -- because you've also

9    made additional arguments here and I want to grapple with

10   them.

11             MS. ELICKER:  So for those arguments,

12   Your Honor, there were two things that guided our brief.

13   In no way are we walking away from the justification that

14   the BOP itself relied on.  However, our ability to argue

15   in favor of the BOP's written justification is limited by

16   our lack of access to the final PSR.  So, in other words,

17   Your Honor, I think the government was reluctant to rely

18   on the initial PSR and its statements respecting Janes

19   Doe 2, 3, and 4 because it is unclear whether any of the

20   allegations contained -- or any of the statements

21   contained in the initial PSR remained in the final PSR,

22   because we don't have it.  The sentencing judge said in

23   the sentencing transcript that he had heard the objections

24   raised by counsel and was accepting the final PSR and not

25   explicitly ruling on the objections because it seemed,

1    from the sentencing transcript, that at least some of the

2    objections had resulted in changes.  So, in other words,

3    if the Court is going to require, you know, the citation

4    to the PSR to substantiate what BOP did, we would ask for

5    access, as Your Honor requested and as Counsel has

6    offered, we would request to be able to do so based on the

7    final PSR once filed.

8              THE COURT:  So are you then speculating that

9    your client relied on portions of the PSR that you have no

10   idea what they are?

11             MS. ELICKER:  No, Your Honor.  BOP -- it was

12   merely as a matter of making representations in this

13   Court.  What we did is repeated to Your Honor what they

14   put into their administrative filings.

15             THE COURT:  Right.  I've looked at some of those

16   filings.  One of them says -- it looks to me it's filed,

17   it's the third document filed to the attachment to the

18   habeas.  It says that Ms. Bronfman "participated in

19   efforts to recruit and secure immigration status for

20   non-citizens so they could work in one or more

21   Nxivm-affiliated functions or to become sexual partners

22   for a co-defendant," and then it goes on to identify the

23   particular persons.  Mr. Sullivan makes, it seemed to me,

24   like a pretty compelling case that's simply not true.  So

25   what's your response?

1          MS. ELICKER:  Well, Your Honor, BOP is entitled

2     to rely on the PSR.  If the judge had -- sentencing judge

3     had rejected those portions of the PSR, they wouldn't

4     appear and BOP wouldn't be relying on them.  If the

5     sentencing judge accepted them and allowed them into the

6     PSR, how is BOP to decline to rely on the PSR?

7          THE COURT:  Got you there.  I take it, then,

8     that you're saying that you believe that the revised PSR,

9     if we only had it, would support that, those allegations.

10          MS. ELICKER:  Yes.

11          THE COURT:  Okay.

12          And suppose it doesn't.  If, by chance, it

13     doesn't -- I do a lot of sentencings.  There's usually not

14     a lot of change at the very last moment.  Is there some

15     reason why you think that those very specific allegations

16     are in the revised PSR?  You're saying it's possible.

17          MS. ELICKER:  It's possible.

18          THE COURT:  Okay.

19          MS. ELICKER:  And more importantly, we're saying

20     that the Court is not limited to the PSR.  So even if

21     it -- and this is where *LaSorsa* is a powerful case for the

22     government.  The BOP could have gotten it completely

23     wrong.  And as long as in court there is an argument -- in

24     other words, before --

25          THE COURT:  Right.  So I'm going to get to that

1    in a moment.  I get the *LaSorsa* point.

2            So the next BOP statement I have, it looks like

3    it's from the unit manager, Mr. Cole, on March of '21.

4    It's page 5 of 7 of Document 1-3.  It recites her charges

5    and then says due to the charge of conspiracy and overall

6    characteristics of the offense the Designation Center

7    somewhere in Grand Prairie, Texas, "deemed it appropriate

8    to apply this PSF as the conspiracy relates directly to a

9    sexual nature."  That's not enough to meet the

10   requirements of the PSF, is it?

11           MS. ELICKER:  Conspiracy, I mean if --

12           THE COURT:  The PSF says it could be the offense

13   of conviction or otherwise, there has to be official

14   documentation, like a PSR, that "clearly indicates the

15   following behavior occurred" and then gives the four types

16   of behaviors.  It strikes me that that's not really

17   defensible, that statement of the BOP there, is it?

18           MS. ELICKER:  That there was a conspiracy --

19           THE COURT:  Simply say, well, you know, the

20   whole thing involved a lot of sex.  There's a lot of sex

21   here, a lot of conspiracies and sex here, so despite the

22   fact that Ms. Bronfman was never convicted of a sex crime,

23   we can basically pin it on her according to the hoary

24   legal principle known as guilt by association, mere

25   association.

1          MS. ELICKER:  Well, Your Honor, one thing that

2   came through reading -- and again, my focus was on the

3   sentencing memorandum because that was what was available

4   to me.

5          THE COURT:  Sure.

6          MS. ELICKER:  The sentencing memorandum

7   incorporated findings from the PSR.

8          THE COURT:  Right.

9          MS. ELICKER:  One thing that was clear is that

10   the women that Ms. Bronfman brought to the United States

11   on immigration papers, when they arrived in the

12   United States did not have financial means.  One of the

13   ways that she brought them, as I understand it, on the

14   promise of paying them, and they didn't have money, and

15   that made them susceptible to exploitation.  Which is what

16   happened.  She was not aware, but certainly it's not

17   merely that she knew these people and brought them to the

18   United States and they had absolutely no connection to the

19   sexual crimes.  They are the people who -- at least

20   according to the PSR, they are the people who were then

21   the victims of the sexual crimes.

22          THE COURT:  Right.

23          MS. ELICKER:  So I think it's not --

24          THE COURT:  And which of the four buckets in the

25   PSF does that meet, that conduct?

1          MS. ELICKER:  Well, if she brought people who

2     were minors to the United States, then it would satisfy

3     the second bucket.  If they --

4          THE COURT:  If she did.

5          MS. ELICKER:  -- became sexual victims.  Because

6     they were brought into the United States destitute, that

7     they became victims.

8          THE COURT:  But when you say if she did that,

9     you're thinking that might be supported by that mystery

10    PSR that we don't know exactly what it says?

11         MS. ELICKER:  Right.

12         THE COURT:  Let's suppose, just hypothetically,

13    it's not supported by it.  Would that change?

14         MS. ELICKER:  I think it is possible that BOP --

15    it's a question.  It is possible that BOP could review the

16    PSR and come to an erroneous conclusion.

17         THE COURT:  So I guess what occurs to me is you

18    see this concern raised by Mr. Sullivan.  There's a habeas

19    filed.  You have client contact and engagement here.  Why

20    doesn't it make sense to go back to the client and say I'm

21    trying to get a better understanding.  I'm not asking you

22    to disclose what your client and you are saying, but I'm

23    trying to figure out kind of why I'm here, in part,

24    though.  Because if the client messed up and just made a

25    mistake, and they do sometimes because they're busy

1  people, and they made a determination that's really not

2  supported under the PSF, I'd get it if you said, well,

3  there's this alternative grounds that are frankly a slam

4  dunk of why that applies.  It's not so clear to me your

5  alternative grounds, the intimidating letters, is a slam

6  dunk that it's either sexual contact or sexual act.  I'm

7  just kind of wondering, would you think about going back

8  to the client and maybe saying, you know, it could be that

9  there's been a, you know, just a mistake here that's

10  occurred despite everybody's good intentions?  Would it

11  make sense to kind of look at this one more time and try

12  to figure out maybe there's a way forward?  Maybe not.

13  Maybe they're going to double down and say, you know, the

14  SPF applies for this reason, that reason.  This is what

15  the mystery PSR says.  Does that make sense?  Is that

16  something that the government might be willing to do?

17          MS. ELICKER:  Your Honor, we're always willing

18  to take that information back to the client.  BOP applies

19  these PSFs for lots of different reasons all the time.

20  And they -- it is -- I harp on the liberty interest

21  question because that is very much in BOP's interest,

22  right, to emphasize that application of the PSF is

23  discretionary, it does not implicate a liberty interest.

24          THE COURT:  I'm still going to get to that, I

25  promise you.  I'm kind of on a different part here right

1    now.

2              MS. ELICKER:  I guess just to emphasize -- and

3    I'm perfectly happy analytically to deal with them

4    separately.  For BOP, as a programmatic matter and

5    defending this lawsuit, they are inextricably intertwined.

6    We should not be here because there has been no liberty

7    interest.

8              THE COURT:  I guess I would think that a

9    government institution would say, well, somebody has

10   pointed out that we messed up.  Even though that person

11   may not have a federal court recourse because they don't

12   have a liberty interest that metastasizes into a due

13   process claim, we as a good institution would like to fix

14   it and make sure we didn't make an error because that's

15   just good government.

16             MS. ELICKER:  Yes, Your Honor.  And to circle

17   back to the tax defendant hypothetical, one reason why I

18   can't give a fulsome answer of what level of review or

19   what type of review the Court would apply in such a

20   circumstance is that we really don't see it.  If there is

21   a circumstance, in our experience and BOP's experience,

22   where a PSF like this PSF is entirely without basis, the

23   administrative claim process should uncover that and

24   remedy it before it ever gets to court.

25             THE COURT:  Okay.  So let's suppose, just

1   suppose that the only way the PSF would apply, if it does,

2   is because of these letters that you talk about, the

3   intimidating letters.  Do you have an argument about how

4   those letters meet the sexual act or contact requirement

5   of prong four?

6              MS. ELICKER:  Yes, Your Honor.  And I think for

7   that it's important to not think about the letters in the

8   abstract, but to read about how Judge Garaufis --

9              THE COURT:  Garaufis, yes.

10             MS. ELICKER:  To read how Justice Garaufis --

11             THE COURT:  He's still a judge, not a justice

12   yet.

13             MS. ELICKER:  Pardon.

14             So to read about how he described them.  And we

15   quoted from his sentencing memorandum in our brief at

16   page 7 and 8.  But he described the letters and her

17   conduct after 2017 as working hand-in-hand with Raniere to

18   intimidate and silence victims of his brutal campaign of

19   sexual abuse and exploitation.  The letters are a specific

20   example of that and one that was laid out clearly and

21   therefore one that we repeated in our briefing.  But this

22   was a finding by the sentencing judge of her conduct after

23   2017.  Letters sent to people who are not victims of

24   sexual blackmail may not be sexually aggressive contacts.

25   But in the circumstances here where the victims reached

1    out to Raniere and DOS and asked for the return of their

2    collateral, and the way his sentencing memorandum reads,

3    it was specifically in response to that request for the

4    return of collateral --

5              THE COURT:  So it's sex connected, right?

6              MS. ELICKER:  It's not even sex connected, but

7    it's sex caused.  It was the request for sexual blackmail

8    to be returned that then --

9              THE COURT:  Right, okay.  But does that meet the

10   requirement of the PSF that there was a, quote, sexual act

11   or contact?

12             MS. ELICKER:  Under the circumstances, we

13   believe it does.  And no, the letters themselves -- the

14   letters which were sent in connection with the Mexican

15   attorney did not themselves contain sexual material, but

16   when they were sent to silence people who had requested

17   the return of their blackmail, I'm sure that it felt to

18   those victims as if it was contact that was sexual in

19   nature.

20             THE COURT:  Even though the letters don't talk

21   about sex?

22             MS. ELICKER:  Correct.

23             THE COURT:  Is it best for the BOP to make that

24   determination in the first instance or for government

25   counsel?

1          MS. ELICKER:  BOP does not -- in applying PSFs,

2     BOP does not review the judge's sentencing memorandum; BOP

3     uses the PSR.  So if BOP were to include the sentencing

4     memorandum or trial transcript --

5          THE COURT:  I thought under the PSF they looked

6     to the PSR, but then they say -- and I'm quoting -- "or

7     other official documentation."  Would a judge's sentencing

8     memorandum qualify as official documentation?

9          MS. ELICKER:  I believe so.  It's filed.

10          THE COURT:  So the BOP could indeed have relied

11     on the publicly filed sentencing memorandum, extensive

12     memorandum by Judge Garaufis.

13          MS. ELICKER:  It could have, yes.

14          THE COURT:  And it should have, right?  I mean,

15     in fairness?  Or should it only look to some parts of the

16     documents but not look at other official documents?

17          MS. ELICKER:  I would suggest that BOP need only

18     look as far as it has to in order to find the PSF

19     satisfied.  Why would it look further?

20          THE COURT:  Well, maybe I'll give you an

21     example.  Lots of times the judge actually ends up

22     rejecting portions of the PSR or finds them not credible,

23     allows the information to be continued and contained, but

24     it happens every day, frankly, in federal criminal

25     sentencings where if a judge -- and it's actually quite

1    rare for a judge to issue a detailed written sentencing

2    memorandum, but I can't imagine -- again, this is BOP

3    being a good government institution.  I can't imagine that

4    they would have decided we're just going to not even look

5    to what Judge Garaufis has said.  Instead, we're going to

6    let this thing go down the line where, you know, lawyers

7    have to go to court and start litigating it.  It kind of

8    baffles me why BOP would put on the blinders like that.

9         MS. ELICKER:  I should say, Your Honor, it is my

10   understanding that the PSR is the document that they

11   relied on.  I'm not aware whether they additionally looked

12   at the sentencing memorandum.  And Your Honor, I'm not

13   sure in a circumstance like this where the sentencing

14   judge said I accept the amended PSR.  So under those

15   circumstances, it may be reasonable for BOP, agreed, if

16   the sentencing judge in the context of doing the sentence

17   rejects the PSR, BOP should be aware of that.  BOP may not

18   necessarily be aware if the PSR is the subject of

19   something on appeal.  BOP should be able to rely on the

20   PSR that it receives unless and until there's an appellate

21   decision that somehow rejects a portion of it.  And if

22   they were to actually claim ignorance, I'm not a hundred

23   percent sure how PSRs are upheld.

24        THE COURT:  They're not.  The PSRs aren't, but

25   there can be an appeal of conviction and the sentence, and

1   that may implicate allegations of the PSR.

2           I know you want to talk about liberty interest,

3   and you believe there's none, that this case fails under

4   *Sandin v. Conner*.

5           MS. ELICKER:  Yes.

6           THE COURT:  *Sandin* recognizes the possibility

7   that there could be mandatory language independently of

8   whether there's an atypical hardship that may be

9   sufficient to create a liberty interest.  Do you think

10  that the PSF creates that kind of mandatory language?

11          MS. ELICKER:  No, Your Honor, we do not.

12          THE COURT:  So you're saying no liberty

13  interest, the claim fails even if there was an error in

14  the application of the PSF.

15          MS. ELICKER:  Correct.

16          THE COURT:  And then as to the stigma plus

17  theory of due process here, can you tell me how is it that

18  the *Vega* case, if it is, is distinguishable from this

19  case?

20          MS. ELICKER:  Your Honor, if I'm remembering

21  correctly, part of what was at issue in *Vega* and some of

22  the cases that deal with sex offenders in a prison context

23  is this question of is there something that is going to

24  affect their post-incarceration time.  So in other words,

25  if application of the PSF -- and we cited this in our

1    reply brief -- BOP has a notification manual that

2    essentially says when the following types of people are

3    released from prison, here's who we have to notify.  If

4    someone has a PSF that's based on a conviction, they must

5    notify appropriate state agencies with respect to the

6    sexual offense because that person may have to register as

7    a sex offender.  However, the statement sufficiently

8    carves out people like petitioner who received the PSF not

9    because they were convicted of an offense.

10            So I think this case is fundamentally different

11   from cases that ask whether the prison context is going to

12   somehow affect -- something that happens while

13   incarcerated is going to change their rights.

14            THE COURT:  When they get to the outside.

15            MS. ELICKER:  Correct.

16            THE COURT:  So I saw that, and I saw that in

17   your reply briefing.  I just couldn't quite find it in the

18   ruling itself.

19            MS. ELICKER:  In *Vega*?

20            THE COURT:  In *Vega* itself.  It seemed to me

21   that *Vega* did not make it turn on whether the sexual

22   classification was somehow going to lead to out-of-prison

23   downstream consequences.  It seemed to me, reading the

24   language of *Vega*, it states -- and I'm just quoting from

25   the runover sentence on pages 81 to 82.  It says "it

1    continues to be the case that wrongly classifying an

2    inmate as a sex offender may have a stigmatizing effect

3    which implicates the constitutional liberty interest."

4    And it doesn't seem to me to go on and say, well, that's

5    only so if once that person gets out, then the person is

6    going to get into and have all sorts of reporting

7    obligations, or something like that.

8              MS. ELICKER:  Your Honor, am I remembering that

9    *Vega* dealt with a New York state incarceration?

10             I think the question would be -- I'm not

11   intimately familiar with how New York state's sex offender

12   classification works in the prison system.

13             THE COURT:  Well, it was Connecticut, just so

14   you know.

15             MS. ELICKER:  So it wasn't New York.  I'm still

16   not familiar with how the state system works.  But I think

17   it depends.  If the state -- if the state prison system

18   applies that based only on convictions and then wrongly

19   applies it, that could have a different ramification for

20   the person.  BOP's program statement allows it to apply

21   the category in the absence of a conviction.  So it could

22   be that that language is somewhat not -- it's not specific

23   enough, right?  Just because that says sex offender, it

24   doesn't mean sex offender under state law system is the

25   same thing as being classified as a sex offender --

1            THE COURT:  Isn't it equally stigmatizing?

2            MS. ELICKER:  With respect to stigma,

3    Your Honor's questions to opposing counsel about the way

4    in which the statement was made are very important.  And

5    you know, BOP made this decision for purposes of its own

6    internal prison management.  BOP did not broadcast her

7    categorization under the PSF to the general public.  And

8    it's the stigma -- the stigma that -- there's plenty of

9    stigma that follows simply from the fact of conviction for

10   any crime.  So it's not --

11           THE COURT:  I urge you to maybe take another

12   look at *Vega*.  Because *Vega* doesn't talk about making

13   broad public statements and posting it on the DOC website.

14   It just talks about making a classification decision that,

15   in the Second Circuit's words, that branded Vega as a sex

16   offender there and then goes on through the requisites for

17   a stigma plus claim.  It goes on to cite with approval the

18   Eleventh Circuit's statement, "The stigmatizing effect of

19   being classified as a sex offender" -- classified, it

20   says.  Classified.  Which is exactly what's happened here,

21   it seems -- "as a sex offender constitutes a deprivation

22   of liberty under the Due Process Clause."

23           I have to say I have a hard time seeing how *Vega*

24   doesn't control.  It's from the Second Circuit.  It seems

25   like it allows for a stigma plus theory here.  And I'm

1    just trying to figure out why it's distinguishable.  I get

2    your one point of distinction that you suggested in your

3    briefing and here again today.  Are there any other points

4    of distinction for *Vega*?  Because usually I make it a

5    habit to follow what the Second Circuit rules.  When they

6    make this kind of broad language, I feel kind of bound to

7    follow it.

8            MS. ELICKER:  I'm looking at a footnote we put

9    in our brief to that *Notz* case.  Maybe I'm not following

10   the analytical pieces of this, but in the *Notz* case the

11   Court held that the deleterious effects flowing from a

12   sullied representation standing alone do not constitute a

13   plus under the stigma plus doctrine.

14           So I guess where I'm not following is how is it

15   that having a sullied reputation as a sex offender is, in

16   and of itself, a liberty?

17           THE COURT:  No, that's why it's called stigma

18   plus.  Then the plus, as the Court explains, is that there

19   has to be a "material state-imposed burden or

20   state-imposed alteration of the plaintiff's status or

21   rights."  It seems like a fairly strong argument there's

22   certainly a difference in status as a result of the

23   application of the PSF factor.

24           MS. ELICKER:  Then the idea is that *Vega* has

25   somehow inserted a new standard after --

1          THE COURT:  After *Sandin* and those kinds of

2    cases?  Yes.  The answer is yes.  The answer is that *Vega*

3    acts in parallel with *Sandin* because *Sandin* applies

4    generally to when there are restrictions imposed.  You

5    ask, well, is it atypical hardship beyond what someone

6    would ordinarily expect?  But in the stigma plus context

7    it makes a difference that the restriction here is as a

8    consequence of the stigmatic branding, as it were.  And

9    I'm quoting the Second Circuit here.  So it's not

10   repudiating *Sandin*; it just is part of the overall

11   doctrine, it strikes me.

12          MS. ELICKER:  Your Honor, we're not aware of any

13   cases that have applied *Vega* to find that wrongful

14   application of a PSF or, rather, any application.  I

15   suppose the question then is a person even who rightly has

16   a PSF applied to them, imagine that the --

17          THE COURT:  They don't have a claim.  That's why

18   the Second Circuit threw out Vega's claim.  They said no

19   question that you should have been classified and

20   described the horrendous conduct that the person engaged

21   in.  That's not this case.  This case, Mr. Sullivan is

22   making a pretty convincing showing, to me at least, that

23   Ms. Bronfman is not actually doing sexual acts, sexual

24   contact.  I have to think more about your counterarguments

25   on that, but I'm pretty troubled by what looks to me like

1     the initial determinations by the BOP itself, which is

2     supposed to be the one making the decision, not counsel,

3     seem to be not really well-grounded.  That's the concern.

4             MS. ELICKER:  Your Honor, respectfully, we would

5     be happy to, if Your Honor is truly looking for more to

6     read on this, would be happy to look further into --

7             THE COURT:  That would be great.

8             I'm hopeful.  I'm really hopeful, frankly, that

9     there might be a conversation again with the BOP about

10    making sure that, you know, things were done in the way

11    that they should be done.  And then if the results of that

12    is, well, things are going to stay as they are, you know,

13    let's litigate some more.  And I'll decide these

14    questions.  I'll decide if *Vega* -- what that does,

15    consequence here.  I know, looking and keeping cognizance

16    as well of the Connecticut Supreme Court's decision in

17    *Anthony A.* case, 326 Conn. 668, which also talks quite a

18    bit about the stigma plus theory.  It's a more recent

19    decision, 2017.  It's a federal constitutional decision,

20    though.  And talks a bit about just what does the plus

21    mean and how much of a plus does it need to be.  And

22    decides, I think fairly clearly, at the end of it that at

23    least to the extent that somebody is being required to

24    engage in sex offender treatment programming, that would

25    be enough to be the plus.  It leaves a little bit less

1    clear whether what other restrictions might do that.

2              MS. ELICKER:  Your Honor, was there -- were

3    there allegations in this case about the FIT program?

4              THE COURT:  No, I don't think there have been.

5    I didn't really hear -- I didn't read the petition to

6    allege stigma plus as a theory.  I read it to allege

7    *Accardi*, which is a much broader theory.  There weren't

8    allegations about FIT plus.  I realize I have to figure

9    out what to do about that as well, I get that.

10             MS. ELICKER:  Thank you.

11             THE COURT:  I understand why you'd be looking at

12   this and saying, well, goodness, they're just changing

13   their horses.  And they have.  It looks to me that they

14   have.

15             MS. ELICKER:  Thank you for answering my

16   question.

17             THE COURT:  Sure.

18             What else?  Anything else?  We've been at it for

19   quite a while.

20             MS. ELICKER:  Nothing else, Your Honor.

21             THE COURT:  Okay, great.

22             Mr. Sullivan, anything else, briefly?

23             MR. SULLIVAN:  You'll be happy to hear I have no

24   rebuttal, Your Honor.

25             There's just one matter on what you called the

1    mysterious PSR.  I've been in conversation with my

2    cocounsel.  I don't know what that is.  I don't recall

3    having seen it.  My cocounsel represented that he doesn't

4    see it on PACER.  We waive any objection.  If BOP has

5    another PSR, they can file it if my waiver is sufficient.

6    As I stand here, I don't know what that document is.

7         THE COURT:  You'll need to communicate that.

8    I'm going to let counsel work that out.  I assume you

9    could make a waiver, I would think, for the disclosure of

10   the PSR that's in the possession of the BOP, I assume.

11   And it could be filed under seal and all appropriate

12   protections made.

13        MS. ELICKER:  If I may, Your Honor, BOP will not

14   release it to our office absent a court order.  So if

15   counsel is in agreement, perhaps Your Honor would be

16   willing to enter an order.

17        THE COURT:  I would be willing to do that.  If

18   you file a proposed order, I'm happy to do that.

19        MR. SULLIVAN:  Thank you, Your Honor.

20        THE COURT:  Okay.  All right.  Well, you've

21   given me plenty to think about.  What I'm going to ask you

22   to do is, as far as I can tell, you have a little bit of

23   time to talk this through.  We've covered a lot of ground

24   today.  I'd like to ask all of you to go back and try to

25   figure out is there a resolution in this case that's

1    possible short of additional litigation here which might

2    involve fact finding, frankly.  We haven't even really

3    scratched the surface on some of that.  It's not very

4    clear whether I could just decide on the papers all of the

5    claims here.  It strikes me that there might be grounds

6    for trying to resolve this on your own.  May not be.  In

7    which case I'm happy to go back and do my job.  I love my

8    job, and I'll do that as best I can.  Can I ask you all to

9    do that?  And maybe we'll set up a status conference in

10   about 21 days' time.

11              MR. SULLIVAN:  Very well, Your Honor.

12              THE COURT:  Maybe I'll ask, Ms. Barry, if you

13   have a time we can try to set for that.

14              We'll do 5:00 p.m. on the 26th.  I hope that's

15   okay with folks' family needs and all that.  Is that

16   possible?  I'm on trial that date; otherwise, I would do

17   it earlier in the day.

18              MR. SULLIVAN:  Yes, Your Honor.

19              MS. ELICKER:  Yes.

20              THE COURT:  Anything else?

21              Thank you all.  Stand in recess.

22                   (Proceedings adjourned at 3:39 p.m.)

23

24

25

1

2

3                          C E R T I F I C A T E

4

5          RE:  CLARE BRONFMAN v. TIMETHEA PULLEN, ET AL.

6                        No. 3:22CV828(JAM)

7

8          I, Diana Huntington, RDR, CRR, Official Court

9   Reporter for the United States District Court for the

10  District of Connecticut, do hereby certify that the

11  foregoing pages 1 through 59 are a true and accurate

12  transcription of my shorthand notes taken in the

13  aforementioned matter to the best of my skill and ability.

14

15

16

17

18                    _____
                              /s/

19                    DIANA HUNTINGTON, RDR, CRR
                         Official Court Reporter
20                    United States District Court
                       141 Church Street, Room 147
21                    New Haven, Connecticut 06510
                          (860) 463-3180

22

23

24

25